**People of the State of Illinois, Plaintiff-Appellee, v. David Olbrot, Defendant-Appellant.**

**Gen. No. 52,718.**

First District, First Division.

December 8, 1969.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Professor James R. Thompson, Northwestern University School of Law, Theodore A. Gottfried, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Assistant State's Attorney, of counsel), for appellee.

MR. JUSTICE BURMAN delivered the opinion of the court.

The defendant, David Olbrot, was found guilty of armed robbery after a trial before a jury. He was sentenced to a term of ten to fifteen years in the penitentiary.

The defendant contends, on appeal, that (1) the lineups in which the defendant was identified were so suggestive and unfair as to deny him Due Process of Law; (2) the State failed to prove him guilty beyond a reasonable doubt; (3) the introduction of evidence of another crime deprived him of a fair trial; and (4) the court erred in refusing to allow defense counsel to impeach the State's rebuttal witnesses with inconsistent statements made at a prior hearing.

At approximately 1:30 a. m., on January 3, 1967, Edwin A. Zaraza, a pharmacist, and Jerry Roche, a clerk, were working at the Musket and Hendricksen Pharmacy at 4200 North Central Avenue when two men entered with drawn guns and announced a robbery. Zaraza was behind the prescription counter, and Roche was alongside. A man whom Zaraza and Roche identified in court as the defendant, stood at the cash register about twelve feet from them. The other man said that he wanted certain drugs. Zaraza put them in a bag and gave it to him. The man asked for needles and took a handful of boxes of needles when shown where they were. This man also went to the cash register which contained about $150. When the men left the money was gone. This other man also took some money from a drawer. Zaraza and Roche were then told to lie on the floor which they did just before the robbers left. The incident took from three to five minutes.

Zaraza testified that he described the defendant to the police as being about five feet three, 130 pounds, and either Puerto Rican or Italian. He had long black hair and wore a black leather jacket and sun glasses of the wraparound type. The other man was five feet eight or nine, with a lighter complexion and lighter hair. He wore a light colored jacket, a sweater shirt, light slacks, and was in his early twenties.

Zaraza testified on cross-examination that he identified the defendant when he attended a lineup of four men in the lockup at a police station two or three days after the robbery. One of the men in the lineup was about six feet tall, while the other two were five feet ten or five feet eight, or maybe shorter. The defendant was the shortest one in the lineup, and at that time his face was badly bruised. Zaraza said that he did not look much different from the time when he was in the store. He said that he requested the police to put

sunglasses on the defendant. He requested this because, although he was fairly sure, he wanted to make certain that it was the same man. Zaraza stated that the pharmacy was well lit with fluorescent lighting. He testified that he looked directly at the defendant several times in the pharmacy. At one time they were within five feet of each other.

Jerry Roche also identified the defendant in court as the man who stood next to the cash register. He testified that while the other man took the money out of the cash register, the defendant had a gun pointed at him and told him not to move or he would be a dead man. At that time the defendant was two feet away from him. Roche described the defendant's wearing apparel as being black pointed shoes, black pants, a black sweater, a shirt underneath the sweater and wraparound sunglasses. He said the defendant's hair was long, black and combed straight back. He described the other man as being three to four inches taller, with a lighter complexion and lighter hair. He said the men were in the store about three minutes.

Roche testified on cross-examination that he attended a lineup at the police station before Zaraza did. The lineup consisted of three men, one of whom was over six feet, another about five feet seven and the defendant who appeared badly beaten up. Roche didn't want to identify the defendant until they put sunglasses on him. He explained that the defendant looked as much like the man in the store as anybody could, but that he wasn't ready to identify him without the sunglasses. During the course of the robbery he paid more attention to the defendant.

Officer Raymond Golnick testified that he and several officers were staked out in an apartment on the second floor of 3423 West Drummond on January 6, 1967. At 5:00 a. m., they heard a knock on the door. As Officer Golnick opened the door, he identified himself as a po-

lice officer. The defendant pulled a revolver from his pocket and pointed it at the officer who heard a click. Force was necessary to subdue him. The officers found three cartridges in the weapon after arresting the defendant. Officer Raymond Springer corroborated Officer Golnick's version of what took place. He also testified that the defendant later kicked him in the groin several times. He then struck the defendant in the head several times with the stock of his gun.

Frank Kopp, a bartender at the Club Caravan, located at 2119 South Halsted, testified for the defense that he saw the defendant in his tavern on the night of January 2nd and 3rd, between 9:30 or 10:00 p. m. and 4:00 a. m. He said that the defendant shot pool that night with a Kenneth Eichert and an Omar Wilson. He didn't see the defendant leave the tavern during that time period. Kopp testified that he had never seen the defendant before that night, but knew the other two men. He said that he was introduced to the defendant that night.

Marian Olbrot, the defendant's mother, testified that she saw her son at 2:00 p. m. on January 2, 1967, at their home with Omar Wilson. At that time, the defendant was wearing a corduroy tan jacket, dark slacks and a white shirt. Mrs. Olbrot said that she bought her son's clothes and that he never owned a black leather jacket or sunglasses. The next time she saw him was when he came home late on January 3rd. She testified that she didn't know where her son was between 1:00 and 2:00 a. m. of January 3rd. Rosalie Shaw, the defendant's sister, testified that she saw the defendant on January 2, 1967, at 4:00 p. m. at her home. He was with Omar Wilson, her brother-in-law. The defendant wore a tan jacket and dark slacks. The two men left her house at 9:00 p. m.

The State called Josephine Tripoli, Leonard Jay, Jr. and Leonard F. Jay as rebuttal witnesses. Mrs. Tripoli testified that at approximately 1:00 a. m. on January

371

3, 1967, two men entered her tavern at 6232 W. Addison with guns in their hands. One of them was the defendant. There were six customers in her bar at that time, including Mr. Jay, Sr. and Mr. Jay, Jr. She gave a description of the defendant to the police. She said that the defendant was about six feet away from her and that the robbery took about ten minutes. Leonard Jay, Jr. testified that he was in the tavern shooting pool with his father and brother when he saw the defendant who was wearing a black leather jacket enter with another man about 1:00 a. m. on January 3, 1967. Both were carrying guns in their hands. Leonard F. Jay testified that he was in the tavern with his two sons when the defendant and another man entered carrying guns about 1:00 a. m. on January 3, 1967, and held up the tavern.

The defendant contends that the lineups from which he was identified were so unfair and suggestive as to deny him his right to due process of law. He also contends that it was reversible error to admit the courtroom identifications into evidence because they were tainted by the prior illegal lineups. It is argued that in both lineups the defendant was considerably shorter than the other men and that neither witness made a positive lineup identification until after the defendant was caused to wear sunglasses, while at the trial both witnesses positively identified the defendant without sunglasses.

██ ██ In People v. Terczak, 96 Ill App2d 373, 238 NE2d 626, the defendant also attacked a lineup where he claimed the other three persons were not sufficiently comparable to him in size, age and appearance. The Appellate Court held, as we do here, that these matters go to the weight of the testimony rather than its admissibility. The record is clear in the case at bar that both

witnesses had ample opportunity to observe the defendant in a well lit drugstore. They gave a complete description to the police of the defendant which included his clothing and style of hair. Neither witness made a hasty identification at the lineup. Each requested to see the defendant with sunglasses on, as they had seen him in the store. All of this, including the description of the lineups, was presented to the jury. The identifications were unshaken during cross-examination. Under all these circumstances we cannot say that these identifications violated the due process standards of Stovall v. Denno, 388 US 293, 87 S Ct 1967. We hold that the lineup identifications were admissible and did not taint the courtroom identifications.

██ ██ The defendant further contends that the introduction of evidence of other crimes was reversible error. Although this is normally a valid contention, we think that the evidence was proper in this case. It placed the defendant with a companion in the immediate area of the pharmacy a short time before the robbery. It showed that at this time he possessed a gun. It thus rebutted the contention of the defendant that he was in another tavern during that time period. The great detail about this other robbery was brought out by the defense on cross-examination. Since the detail was not presented by the State, it does not even fall under decisions such as People v. Bond, 99 Ill App2d 45, 241 NE2d 218, which disapproved such detailed testimony, but did not hold that its admission required reversal. We think the testimony was properly admitted.

It is also argued that the court erred in refusing to allow defense counsel to impeach the State's rebuttal witnesses with inconsistent statements made at a prior hearing. The defendant contends that a contrary statement made at a prior court hearing may be testified to by anyone who heard it, and relies on People v. White-

head, 35 Ill2d 501, 221 NE2d 256, and People v. DeBerry, 72 Ill App2d 279, 219 NE2d 701. In Whitehead the court held that defense counsel had been effectively foreclosed from impeaching the State's most important identification witness when the trial court prevented him from bringing in the court reporter from the prior proceeding. In DeBerry the court said that the reporter's testimony based on his notes is the best evidence, but would have admitted the testimony of a witness to the preliminary hearing in which the alleged inconsistent statement was made since there had been no reporter present. However, a proper foundation had not been laid.

■■■■ In this case, defense counsel asked Mr. Jay if he had testified before that the small robber was five feet eight. Mr. Jay replied that he might have said that. There was therefore no need for further impeachment on that point. In regard to Mrs. Tripoli, defense counsel sought to bring in a lawyer who was present at the prior hearing where her testimony was given. The court informed counsel that he could bring in the transcript or the court reporter if he wished to prove impeaching statements. No claim was made by defense counsel, who apparently participated in the other trial that he could not obtain a transcript or was unable to bring in the court reporter to testify from his notes. Under DeBerry the court reporter's transcript or his notes were the best evidence. Absent a showing that they were not obtainable, there was no foundation for the testimony of the witness to the impeaching statements, and it was not error to exclude him.

■■ ■■ Finally, it is alleged that the State failed to prove the defendant guilty beyond a reasonable doubt. The defendant argues that this is so because of the weak identification evidence and the testimony of an alibi for the defendant. It is well established that we will

374

not disturb the findings of the jury or the judgment of the trial court unless the proof is so unsatisfactory as to justify a reasonable doubt as to defendant's guilt. We conclude that the testimony was sufficient to establish the guilt of the defendant beyond a reasonable doubt.

For the reasons given the judgment of the Circuit Court is affirmed.

Judgment affirmed.

ADESKO, P. J. and MURPHY, J., concur.