THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
NED OWENS, Defendant-Appellant.

First District (5th Division)   No. 61649

Opinion filed March 11, 1977.

Saul R. Leibowitz and Thomas E. Holum, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Michael E. Shabat, and Edward H. Phillips, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant, Ned Owens, was indicted for the murder of Frank Davis. (Ill. Rev. Stat. 1971, ch. 38, pars. 9—1 and 9—1(a-2).) He was found guilty by a jury and sentenced by the court to 30 to 60 years imprisonment. Defendant appeals and here contends: (1) he was not proven guilty beyond a reasonable doubt; (2) the pretrial identification procedures employed by the police were so suggestive as to give rise to a substantial likelihood of irreparable misidentification so as to deny defendant due process of the law; (3) he was deprived of a fair trial by the court's refusal to allow the rehabilitation of an alibi witness after the latter's impeachment; (4) the trial court erred in allowing the introduction of three 10-year-old prior convictions to impeach his credibility; (5) the prosecutor's final argument was prejudicial in commenting that an alleged alibi witness had failed to testify, and in characterizing defendant's testimony as false; (6) the trial court erroneously instructed the jury that the State need not prove motive; and (7) his sentence was excessive. We affirm.

The pertinent facts follow.

On April 29, 1974, defendant filed pretrial motions to suppress evidence

of prior convictions, and to suppress any in-court identification by the witness, Fred Carson. At the hearing on the motion to suppress identification held on July 12, 1974, Carson testified that on May 31, 1973, he observed two men engaged in conversation in the vicinity of 50th, or 51st Street and Calumet, Chicago. As one man turned and walked away, the other man pulled a revolver and shot the victim in the back. The following Saturday, June 2, the witness viewed a mixed group of 10-12 colored and black-and-white photographs supplied by a police officer. Carson identified defendant's photograph as being that of the man who had fired the revolver, and testified that he did so without prompting or comment from the police officer as to which photograph to select. The next day Carson viewed a lineup of five men, and again identified defendant. On cross-examination, the witness stated that in no way had any officer indicated to him which photograph or lineup subject to select.

Investigator Patrick Carroll testified that he had interviewed Carson on the day of the shooting, and Carson had at that time given Carroll a general description of the man who did the shooting. On June 6, Investigator Carroll went to Carson's place of employment and showed him six black-and-white photographs, and Carson identified the photograph of defendant. Investigator Carroll then showed Carson a color photograph of defendant, which Carson said was a closer likeness of the man he had seen do the shooting. Investigator Carroll did not in any way indicate to Carson which photograph he should identify, and it was only after the witness had identified defendant's black-and-white photograph that the officer showed him the color photograph. The color photograph of defendant was not with the other photographs, but was either in Investigator Carroll's pocket or his partner's pocket until after Carson had identified the black-and-white photograph of defendant. On the basis of the foregoing testimony, the motion was denied.

Prior to commencement of the trial on August 5, 1974, the court heard argument on defendant's motion to suppress evidence of prior convictions. Defendant had been convicted of three counts of armed robbery on February 14, 1958, and had been released from custody on these charges on November 6, 1963. Defense counsel indicated to the court that the release date was approximately 9 years and 7 months prior to the occurrence in the instant case. The court denied the motion.

At trial, Alberta Smith testified for the State that she had known both the victim and defendant for 20-25 years. On May 31, 1973, she attended a card game in a third-floor apartment at 51st Street and Prairie, Chicago, arriving at approximately noon. There were 30-40 other people present, and Miss Smith and a friend, named Laura, became engaged in a conversation with the victim. Defendant asked them to be quiet, and the victim responded by walking around the table, pointing his finger at

defendant, and telling defendant that "he wanted him to quit treating him like he was a damn kid." He further stated that he would go out and call the police and have the game raided. Defendant then closed the game for the day. Upon leaving, Miss Smith stood at the corner of 51st Street and Prairie, talking with the victim and some other friends. Shortly thereafter, defendant and the other participants in the card game emerged from the building. She remembered looking at a clock, and it was then approximately 1:30 p.m. Miss Smith then departed with her friends, last seeing the victim alive at the corner of 50th Street and Prairie.

Upon cross-examination Miss Smith testified that defendant was wearing some kind of green plaid coat, which was "bursting in the back." Upon redirect examination she stated that the coat was a dark green plaid suitcoat. She could not recall the color of his shirt and pants.

Fred Carson testified that at approximately 2 p.m. on May 31, 1973, he was driving north on Calumet Avenue. As he approached 50th Street, he noticed two men to his left. When Carson entered the intersection at the stop sign, he heard a gunshot, looked around, and saw one of the two men shooting at the other. He identified defendant as the assailant. At the time of the shooting, the victim was walking south on Calumet, his back toward the defendant. Both men were facing, and moving, south. As more shots were fired, Carson exited his car and "was just standing there dazed, looking toward the scene." After the victim fell, defendant walked up and shot him as he lay on the ground. Defendant then put the gun in his pants, turned, and walked west through an empty lot, turning south in an alley toward 51st Street. During the time prior to defendant's departure through the lot, Carson had approximately two minutes in which to observe defendant. At the time of the shooting, Carson was 50-60 feet away from the two men, who were 5-10 feet apart from each other. Carson waited at the scene until the police arrived. Approximately one week later, he identified defendant's photograph from a group of approximately one-half dozen, and on June 17, 1973, he identified defendant in a lineup.

Upon cross-examination, Carson testified that when he first noticed the two men he was approximately 50-75 feet away, heading toward them. He ultimately passed them at about 15-20 miles per hour. There were other people standing in doorways near the scene of the shooting. He described defendant as wearing a banlon pullover-type sweater, and greenish pants. About a week after the shooting a police officer came to his house and showed him approximately six photographs, mostly black and white. He admitted testifying at the preliminary hearing that he had viewed 10-12 photographs. He could not describe any of the other people on the scene at the time of the occurrence. Carson again stated that the assailant placed the gun in his pants following the shooting, and then

admitted that at the preliminary hearing he had testified that the man had put the gun into his sweater. He told police at the scene that the assailant was a middle-aged man, 50-60 years old.

Upon redirect examination Carson stated that, shortly after the incident, he gave a description of the assailant to the police as being a male Negro, 5 feet 8 inches tall, approximately 200 pounds, wearing a green banlon pullover-type sweater, and green slacks.

Upon re-cross-examination Carson stated that his attention was first drawn to the two men because they were the only people on the street. He did not notice, at that time, the other people standing in the doorways.

Investigator Patrick Carroll testified that on June 6, 1973, Carson identified defendant's photograph from among six black-and-white photographs shown to him. After Carson identified defendant's black-and-white photograph, he was shown a color photograph of defendant, which he also identified.

Upon cross-examination Investigator Carroll stated that on June 4, 1973, he had interviewed a Willie McClain, who came into the Area One homicide office, related that he lived at 50th and Prairie, and gave a statement as to what he saw. McClain then viewed defendant among a number of other men sitting together at a table, but did not make an identification.

Investigator James Scott testified that on June 17 he conducted a five-man lineup. Carson viewed the lineup, and defendant was arrested at its conclusion.

Upon cross-examination Investigator Scott stated that he went to Carson's home sometime prior to June 17 and showed Carson the same group of photographs which had been shown him earlier by Investigator Carroll. Among the lineup participants, only defendant's picture had previously been displayed to Carson.

Defendant called Clifford Burks as his first witness. Burks was present at the card game on May 31, 1973. After the game closed Burks stood on the corner of 51st Street with some friends. He went to speak with another friend who was eating in a restaurant. Defendant came by and asked for a ride home, which Burks provided. The next time he saw defendant was at about 8:30 p.m. that same evening at Sportsman's Park Racetrack. Defendant wore a green checkered sportcoat at the card game.

Upon cross-examination Burks testified that after leaving the game he saw Miss Smith drive away in a car with others, and he saw the victim leaning on a parking meter near the corner of 51st and Prairie. Burks spoke with his friend in the restaurant for about 3-4 minutes. When he left, the victim was no longer at the corner of 51st and Prairie. When defendant requested a ride home he was carrying the green sportcoat over his arm. Burks could not recall the color of the shirt defendant wore

but stated it was a short-sleeved cotton sportshirt. After dropping defendant at his home, Burks returned to 51st and Prairie, picked up a friend, and proceeded to 50th and Calumet, arriving there 12-15 minutes after leaving defendant. A crowd was gathered at 50th and Calumet, and Burks learned that a man had been killed and the body already removed. During the ride to defendant's home, defendant told Burks he was going to the races and would try to arrive in time for the second race.

Joseph Cooks and Steven Garrison both testified that they saw defendant at Sportsman's Park on the evening of May 31. They met defendant after the eighth race, around 10 p.m.

Defense counsel renewed his motion to suppress evidence of prior convictions, reciting that defendant's discharge had been "nine years and six months before the time of this alleged occurrence." The motion was denied.

Defendant testified in his own behalf that on May 31, 1973, at approximately 11 a.m., he was operating a card game at 237 East 51st Street. He was wearing brown slacks, a green sport jacket, and brown shirt, and tan shoes. After closing the game and cleaning the apartment, he decided to go to the racetrack. Clifford Burks drove him home. Defendant asked his wife if she wished to bet on a horse, and then immediately proceeded to a bus stop in order to go to the train station. He arrived at the bus stop at about 12:30 p.m., and at the train station at about 1:15 p.m. He arrived at Arlington Park Racetrack around 2:20 p.m. He saw Frank Hayes while at Arlington Park. After the last race, defendant took a bus to Sportsman's Park. There, he met Cooks and Garrison. Defendant testified that he had been convicted of "a crime of armed robbery" from which he had been discharged from custody in November of 1963. He denied shooting Frank Davis.

Defendant testified upon cross-examination that after leaving the card game he saw Miss Smith depart from the area in a car, and he last saw the victim at the corner of 51st and Prairie. Burks did not accompany defendant to Arlington Park.

Upon redirect examination defendant stated that he and Burks left 51st and Prairie sometime between 12-12:15 p.m. When they left, the victim was alive, standing on the corner. Upon re-cross-examination he stated that his ride home with Burks took about 10 minutes.

Frank Hayes testified on defendant's behalf that he saw defendant at Arlington Park on the afternoon of May 31, 1973, and that defendant was wearing a green sport jacket. Upon cross-examination he testified further that he had arrived at Arlington Park at about 1:10 p.m., and while he did not see the defendant arrive he did see him prior to leaving the park at 5:30 p.m. It was not unusual for Hayes to meet the defendant at Arlington Park. Hayes denied having told the police that he saw defendant and

Clifford Burks together at the racetrack on May 31. Re-cross-examination revealed that Hayes saw defendant at Arlington Park almost every Thursday.

Investigator Robert Neubauer was called as a rebuttal witness. He testified that in an interview with Hayes, the latter had told him that on May 31, 1973, he had seen defendant at Arlington Park in the company of Clifford Burks.

Defense counsel attempted to have Hayes testify in surrebuttal that he made no such statement; however, the State's objection and motion to strike were allowed.

The State was allowed to read into evidence certified copies of defendant's three prior convictions for armed robbery.

In its closing argument, the State commented several times upon defendant's failure to call his wife as an alibi witness, and characterized defendant's testimony as false. In addition, after the defense had finished its argument, the State tendered an instruction on motive which had previously been withdrawn during the instruction conference. The instruction was accepted by the court over defense counsel's objection.

The jury returned a verdict of guilty on the charge of murder. At the hearing in aggravation and mitigation, the State recommended a sentence of 20-40 years, and the trial court sentenced defendant to 30-60 years.

Defendant initially contends that he was not proven guilty beyond a reasonable doubt. It has repeatedly been held in Illinois that the testimony of even a single witness, if positive and credible, is sufficient to sustain a conviction. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363.) Therefore, defendant attacks the identification testimony of Fred Carson as insufficient, based on Carson's lack of opportunity to observe the assailant in this occurrence. The record does not support this claim.

■■ Defendant lays great emphasis on the fact that when the shooting occurred both the assailant and the victim were facing south, away from Carson, who was at the intersection of 50th and Calumet. This fact, however, does not support defendant's claim that Carson had no opportunity to view the offender's face. Carson had first noted the two men, alone on the street, as he was approaching them from the south. He then drew abreast of, and passed, the men while still observing them. As he neared the intersection, Carson heard shots and exited his car. He then viewed the scene for approximately two minutes as the assailant walked up to the fallen victim, fired more shots, and then turned and walked away toward the west. During the incident, Carson was only 50-60 feet away from the two men. He later described the assailant as a male Negro, 50-60 years old, 5 feet 8 inches tall, weighing approximately 200 pounds. At the time of his arrest, defendant was a 62-year-old Negro, 5 feet 9

inches tall, weighing 195 pounds. The accuracy of this description, and the description of the assailant's sweater as a pullover-type, adequately support the inference that Carson had a good opportunity to view the offender. Indeed, he identified defendant as the assailant on four separate occasions. The weight and credibility to be afforded a witness' testimony is a determination for the jury as the trier of fact, and unless that determination is so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of defendant's guilt, the verdict will not be disturbed on appeal. (*People v. Donald* (1963), 29 Ill. 2d 283, 194 N.E.2d 227; *People v. Dillon* (1975), 28 Ill. App. 3d 11, 327 N.E.2d 225; *People v. Oparka* (1967), 85 Ill. App. 2d 33, 228 N.E.2d 291.) Such is not the case here.

■■ Defendant also emphasizes the alleged inaccuracy of the clothing description given by Carson. The inaccuracy of that description, however, has not been established by the record before us. Shortly before the shooting defendant wore a green plaid sport jacket, and there was some evidence that he was wearing a jacket later in the day at the racetrack. Just prior to leaving 51st and Prairie with Clifford Burks, however, defendant was carrying the jacket on his arm. Carson testified that the offender wore a green banlon pullover-type sweater, and green pants. The only contrary evidence was provided by Burks, who testified that defendant was wearing a short-sleeved cotton sportshirt of unspecified color, and by defendant, who testified that he was wearing a brown shirt and brown pants. To the extent such testimony is conflicting, it is the province of the trier of fact to resolve the conflict and decide which witness or witnesses shall be believed. (*People v. Nance* (1975), 26 Ill. App. 3d 182, 324 N.E.2d 652; *People v. Oestringer* (1974), 24 Ill. App. 3d 185, 321 N.E.2d 146.) Conflict in testimony does not in itself establish a reasonable doubt of defendant's guilt. (*People v. Nance; People v. Clanton* (1973), 16 Ill. App. 3d 593, 306 N.E.2d 486.) On this record, it cannot be said that the jury's determination as to the weight and credibility to be given Carson's testimony over other witnesses' testimony was manifestly erroneous.

■■ Defendant next points to certain discrepancies in Carson's testimony as indicative of its untrustworthiness. For the most part, defendant points to alleged discrepancies between Carson's testimony at trial and his testimony at the preliminary hearing. With two exceptions, however, these prior, apparently inconsistent, statements were never made a part of the trial record. Despite the fact that they are before this court as part of the record on appeal, we may not consider such statements since they are *dehors* the trial record. *People v. Rogers* (1963), 26 Ill. 2d 599, 188 N.E.2d 22; *People v. Brown* (1954), 3 Ill. 2d 623, 122

N.E.2d 153; *People v. Bounds* (1976), 36 Ill. App. 3d 330, 343 N.E.2d 622.

■■ The two discrepancies in testimony which were put into the record at trial were: (1) after stating he had been shown approximately six photographs by the police, Carson admitted that he had previously testified that there were 10-12 photographs; and (2) after testifying he saw defendant put the gun in his pants after the shooting, Carson admitted that he had previously testified that defendant put the gun in his sweater. Such minor discrepancies in a witness' testimony do not necessarily render invalid an identification by that witness, but rather, go to the weight to be afforded such testimony by the trier of fact. (*People v. Bell* (1972), 53 Ill. 2d 122, 290 N.E.2d 214; *People v. Bergeron* (1973), 10 Ill. App. 3d 762, 295 N.E.2d 228.) The two discrepancies in the instant case are not of such a nature as to render the testimony of Carson so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt.

■■ Defendant contrasts the identification testimony of Carson with his own "unimpeached alibi defense." In response, we note initially that the positive and credible identification of a defendant by a single witness is sufficient to convict, even though it may be contradicted by the defendant. (*People v. Donald* (1963), 29 Ill. 2d 283, 194 N.E.2d 227; *People v. Bates* (1975), 26 Ill. App. 3d 306, 325 N.E.2d 123.) Secondly, we note that our review of the record reveals significant impeachment of defendant's alibi defense. Defendant testified that he left the area of the shooting with Clifford Burks between 12-12:15 p.m., and that when he left, the victim was still standing at the corner of 51st and Prairie. This testimony was contradicted by Alberta Smith, who placed defendant at the scene at 1:30 p.m., and by Fred Carson, who identified defendant as the assailant in the shooting, which occurred at approximately 2 p.m. Defendant's own witness, Clifford Burks, contradicted defendant by stating that the victim was not at the corner of 51st and Prairie when he and defendant left the area, and by testifying that he arrived back at the scene *after* the murder, and *after* the body had been removed, within 15 minutes of leaving the defendant. The testimony of Frank Hayes, who saw defendant at Arlington Park Racetrack sometime before 5:30 p.m., and that of the witnesses, Cooks and Garrison, who saw defendant later that night at Sportsman's Park, certainly do not tend to establish defendant's alibi for 2 p.m., the time of the shooting. In light of the foregoing, the alibi testimony was entitled to little weight in the minds of the jurors, and we certainly cannot say the jury erred in choosing to disbelieve defendant's alibi.

■■ Lastly, defendant points out that one Willie McClain was unable

to identify defendant when he viewed him in a group of men at the police station. This fact, however, is irrelevant to any question of what Carson was able to observe and recall. The mere fact that others failed to identify the accused does not require reversal. See *People v. Macias* (1968), 39 Ill. 2d 208, 234 N.E.2d 783, *cert. denied*, 393 U.S. 1066 (1969); *People v. Perkins* (1959), 17 Ill. 2d 493, 162 N.E.2d 385.

■■ Defendant's second contention is that the pretrial identification procedures employed in the instant case were grossly suggestive, and that the trial court erred in denying defendant's pretrial motion to suppress the identification. Preliminarily, we reject, as being without merit, defendant's claim that a photographic identification procedure was impermissible in the instant case because defendant would have voluntarily participated in a lineup. Our supreme court has indicated that photographic identification procedures ought not to be employed when the suspect is *in custody*, and a lineup is otherwise feasible. (*People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819; *People v. Holiday* (1970), 47 Ill. 2d 300, 265 N.E.2d 634.) The rationale of such cases was that "when a suspect is in custody, no investigatory purpose remains to be served—the identification procedures become more prosecutorial in purpose when an individual has been arrested." (*People v. Holiday* (1970), 47 Ill. 2d 300, 306-07, 265 N.E.2d 634, 637.) In this case no identification of the murderer had yet been made, and thus the investigatory purpose of the photographic display is self-evident. "The practice of showing photographs of suspects to witnesses is essential to effective law enforcement." (*People v. Brown* (1972), 52 Ill. 2d 94, 99, 285 N.E.2d 1, 5.) Concerning the substance of defendant's contention, this court recognizes that the burden is on defendant to establish that a pretrial identification procedure was so suggestive as to give rise to a substantial likelihood of misidentification. (*People v. Brown; People v. Johnson* (1970), 45 Ill. 2d 38, 257 N.E.2d 3; *People v. Jackson* (1973), 12 Ill. App. 3d 789, 299 N.E.2d 142; *People v. Tuttle* (1972), 3 Ill. App. 3d 326, 278 N.E.2d 458.) Defendant in the case at bar has failed to fulfill this burden.

A review of the record indicates that nothing improper or suggestive was done during the photographic identification. At the hearing on defendant's motion to suppress the identification, Investigator Carroll testified that he showed Carson six black-and-white photographs of different subjects, including the defendant. The record does not reflect in any way that the police officers directed Carson's attention to defendant's photograph. It was only after Carson had identified defendant from the initial group of photographs that Carroll showed him a color photograph of defendant. Thus, the fact that Carson was shown an additional color photograph of defendant did not render the procedure impermissibly

suggestive. Under such circumstances, we fail to find any potential for error in the photographic identification procedures.

■■■ Defendant emphasizes that Carson's testimony at the suppression hearing indicated a different procedure than that outlined by Investigator Carroll. Carson testified that he viewed a mixed group of 10-12 black-and-white, and color photographs. While such a procedure in itself would not necessarily, without more, be impermissibly suggestive (see *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297), we note that the trial court obviously made its ruling based on the police testimony. In ruling on a motion to suppress, it is the trial court's province to determine the credibility of witnesses, and the weight to be given their testimony, and its findings will not be disturbed upon review unless contrary to the manifest weight of the evidence. (*People v. Patton* (1975), 33 Ill. App. 3d 923, 339 N.E.2d 22; *People v. West* (1975), 25 Ill. App. 3d 827, 322 N.E.2d 587; *People v. Gonzales* (1974), 22 Ill. App. 3d 83, 316 N.E.2d 800.) We find no such error in the instant case.

■■ We similarly dispose of defendant's contention that the lineup viewed by Carson was suggestive. Our finding that the photographic identification was not suggestive naturally results in rejection of defendant's claim that the lineup procedure was tainted by the previous display of photographs to Carson. We also reject defendant's claim that the lineup was suggestive in that defendant was the only person in the lineup whose photograph had previously been shown to the witness. See *People v. Jackson* (1973), 12 Ill. App. 3d 789, 299 N.E.2d 142.

■■ In addition, both at the preliminary hearing and at the trial Carson testified that, at the lineup, none of the police officers influenced in any way his identification of defendant, that defendant was not wearing clothes similar to those worn by the murderer, and that he positively identified defendant by recognizing his face. The photographs of the lineup presented into evidence show that while defendant was the oldest of the five lineup participants, four of the men, including defendant, were approximately the same height and weight. There is no requirement that all men placed in a lineup must be physically identical, and differences in size among them, if not too great, are of little consequence. (*People v. Prignano* (1971), 2 Ill. App. 3d 1063, 278 N.E.2d 128, *cert. denied*, 409 U.S. 851 (1972).) The claim that there were significant differences between the age, size, and appearance of a suspect and the other lineup participants goes to the weight of the evidence rather than its admissibility. (*People v. Norfleet* (1972), 4 Ill. App. 3d 758, 281 N.E.2d 761; *People v. Olbrot* (1969), 117 Ill. App. 2d 366, 254 N.E.2d 569, *cert. denied*, 400 U.S. 959 (1970); *People v. Terczak* (1968), 96 Ill. App. 2d 373, 238 N.E.2d 626.) The jury had both the pictures and the testimony concerning the lineup before

it. Carson's identification of defendant was unshaken during cross-examination, and he had identified defendant prior to the lineup from photographs. Under such circumstances, we hold that the lineup was not so suggestive as to give rise to a substantial likelihood of misidentification. There has been no showing that the lineup identification tainted the courtroom identification. Both were admissible.

■■ Assuming *arguendo*, however, that the pretrial identification procedures employed in the instant case were suggestive, Carson's testimony would still be admissible. Existence of an independent origin will validate an in-court identification even though a previous identification may have been impermissibly suggestive. (*People v. Connolly* (1973), 55 Ill. 2d 421, 303 N.E.2d 409; *People v. Patrick* (1972), 53 Ill. 2d 201, 290 N.E.2d 227.) Carson's testimony that he first viewed the assailant while slowly driving toward him, the fact that he was only 50-60 feet away from the shooting and observed the assailant for two minutes after the initial shots had been fired, and the accuracy of the description he gave police are clear and convincing evidence that his identification of defendant had an origin sufficiently independent of the photographic or lineup identification.

■■ Defendant's third issue is that the trial court erred in refusing to allow the rehabilitation of an alibi witness who had been impeached by use of a prior inconsistent statement. The rule in such cases is that when proof is introduced that a witness has made a prior inconsistent statement, the witness should be afforded an opportunity of explaining the statement and showing the circumstances under which it was made. (*People v. Hicks* (1963), 28 Ill. 2d 457, 192 N.E.2d 891; *People v. Simmons* (1916), 274 Ill. 528, 113 N.E. 887.) The testimony sought to be elicited, however, must actually be rehabilitative, seeking to explain the prior statement or reconcile it with the current testimony. It is improper to rehabilitate the witness by simply asking the witness to state that the testimony was true without explanation of the contradictory testimony. (*People v. Hicks; Clayton v. Bellatti* (1966), 70 Ill. App. 2d 367, 216 N.E.2d 686.) In the instant case the questions posed by the defense counsel were not designed to elicit an explanation of the witness' prior statement, but rather only sought to reaffirm that the inconsistency existed.

■■ The record shows that Frank Hayes testified for the defense that he met defendant at Arlington Park Racetrack on the afternoon of the shooting. On cross-examination Hayes denied that he had previously told investigators that he had seen defendant at the racetrack that afternoon in the company of Clifford Burks. In rebuttal, Investigator Robert Neubauer testified for the State that Hayes had told him that he saw defendant and Burks together at Arlington Park on May 31, 1973. Defense counsel recalled Hayes to testify in surrebuttal. The following exchange occurred:

"Q. Mr. Hayes, the State's Attorney asked you if you had any conversation with a certain investigator—

Let me ask you, sir, if you told that investigator that you saw Ned Owens and Cliff Burkes [*sic*] at the races?

A. I did not.

Q. What, if anything, did you tell him, sir?

A. Well, he asked me did—

MR. JOHNSON: Objection, your Honor, ask for a sidebar."

During the sidebar conference, the prosecutor objected that the question had been asked and answered. In response, defense counsel stated that he wanted "to make it plain that Mr. Hayes' recollection of that conversation is contrary to" Investigator Neubauer's. Based on this record, we find that the trial court properly sustained the State's objection and instructed the jury to disregard Hayes' testimony. The factual issue sought to be established by defense counsel had already been joined. The examination of Hayes was not aimed at qualifying or explaining the inconsistency, but rather at emphasizing it.

■■■ Defendant next contends that the trial court erred in allowing the State to introduce into evidence defendant's three 1958 convictions for armed robbery to impeach his credibility. Defendant had been discharged from custody on these convictions in November of 1963. In *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, our supreme court held that evidence of a prior criminal conviction is not admissible for impeachment purposes if more than 10 years has elapsed since either the date of conviction or the date of release from confinement. Where either of these dates fall within the *Montgomery* proscription the trial court has no discretion and must not allow use of the convictions. (See *People v. Cox* (1972), 8 Ill. App. 3d 1033, 293 N.E.2d 727.) It is apparent in the instant case that the trial court, defense counsel, and the prosecutor read the 10-year *Montgomery* limit as dating from the time of release (November of 1963) to the time of the occurrence for which defendant was on trial (May 31, 1973), which would equal less than 10 years. This calculation, however, was erroneous as the *Montgomery* proscription dates from the time of release to the time of trial. (See *People v. Barnett* (1975), 34 Ill. App. 3d 174, 340 N.E.2d 116; *People v. Bentley* (1973), 11 Ill. App. 3d 686, 297 N.E.2d 282; *People v. Petty* (1972), 3 Ill. App. 3d 951, 279 N.E.2d 509.) Defendant's release in November of 1963 occurred approximately 10 years and 8 months prior to the instant trial and we find that the trial court erred in not granting defendant's motion to suppress use of the convictions.

■■ We find further, however, that defendant has waived such error by first introducing evidence of his prior convictions during his own direct examination. Regardless of the *Montgomery* rule, through

testimony on direct examination of "a" conviction of armed robbery from which he had been discharged in 1963, defendant not only initiated the line of inquiry, but opened up the subject for fuller explanation. (See *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 292 N.E.2d 387.) Placed in context, it is clear that defense counsel, apparently for tactical reasons, initiated the question of prior convictions. A defendant can neither complain of the admission of testimony which was invited by his own tactics at trial (*People v. Bell* (1972), 53 Ill. 2d 122, 290 N.E.2d 214; *People v. Barksdale* (1974), 24 Ill. App. 3d 489, 321 N.E.2d 489), nor object to evidence of another crime where he himself has introduced evidence of that other crime. (*People v. Barksdale; People v. Sisson* (1969), 116 Ill. App. 2d 66, 253 N.E.2d 486.) If a defendant procures, invites, or acquiesces in the admission of evidence, even though it be improper, he cannot complain. (*People v. Burage* (1961), 23 Ill. 2d 280, 178 N.E.2d 389, *cert. denied*, 369 U.S. 808 (1962); *People v. Stephens* (1974), 18 Ill. App. 3d 971, 310 N.E.2d 824.) Thus, in the instant case the convictions were properly offered to dispel the impression left by defendant's testimony that he had been released in 1963 from custody on only one armed robbery conviction, rather than three.

■■ Defendant's fifth issue is that the prosecutor's closing argument was unfair and inflammatory. We disagree. In closing, the prosecutor commented several times upon the failure of defendant's wife to testify in his behalf. The general rule is that it is improper to comment on defendant's failure to present witnesses when such witnesses are equally accessible to both parties. (*People v. Rubin* (1937), 366 Ill. 195, 7 N.E.2d 890; *People v. Munday* (1917), 280 Ill. 32, 117 N.E. 286.) Where, however, defendant injects his activities with a potential witness into a case to establish an alibi, his failure to produce such a witness is a proper subject for comment by the prosecutor during closing argument. (*People v. McShan* (1975), 32 Ill. App. 3d 1068, 337 N.E.2d 263; *People v. Stephens.*) Thus, the comments complained of were properly made in the instant case since defendant testified on direct examination that he was at home with his wife just prior to leaving for the racetrack at 12:30 p.m. on the day of the shooting.

■ We also find that the prosecutor's characterization of defendant's testimony as false was proper in the instant case. The rule is that it is improper for the prosecutor to state his opinion respecting a defendant's guilt unless he states, or it is apparent, that his opinion is based solely on the evidence. (*People v. Jackson* (1966), 35 Ill. 2d 162, 220 N.E.2d 229, *cert. denied*, 393 U.S. 942 (1968); *People v. Williams* (1962), 26 Ill. 2d 190, 186 N.E.2d 353.) A prosecutor may call a witness false, if in so doing, he relies on the evidence and the inferences from it to support his conclusion. (*People v. Jackson* (1974), 19 Ill. App. 3d 689, 312 N.E.2d 405, *cert.*

*denied,* 420 U.S. 935 (1975).) Each case of this kind, however, must be decided on its own facts. (*People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880.) In the instant case, the complained of characterization occurred in the following passage:

> "He [defendant] said on the witness stand, I believe, that he left at about 12:00 noon or 12:15, got the 12:25 bus. Again, I ask you to use your common sense, as the Court will instruct you, how could you possibly have left at 12:15 and be on the 12:25 bus, and then his own witness, Cliff Burks comes back to the scene and sees the crowd there and the body is already removed.
>
> Ladies and gentlemen of the jury, I submit to you it happened according to the testimony of Alberta Smith. He is not on the train out to Arlington race track. So, not only do we have the testimony of Alberta Smith, but his own witness. Who would have been the person to corroborate him, the natural person, if his testimony was truthful? His wife. She could say, yes, he came home, he did not change clothes, I didn't see a gun when he came in, and he immediately left for the race track. Why wasn't she called? Ladies and gentlemen, she was not called because she could not support his false testimony, and I don't blame Ned Owens really for testifying falsely. Ned Owens is the defendant in this case."

Upon review, it is apparent to this court that the prosecutor was not merely expressing an unsupported personal opinion, but rather was basing his comment upon the failure of any witnesses to corroborate defendant's testimony that he left the scene almost two full hours before the shooting, and was on his way to the racetrack when the shooting occurred.

Defendant's sixth contention is that the trial court improperly instructed the jury that the State need not prove motive, when the State had presented evidence of and argued motive. The record discloses, however, that this objection was not made before the trial court, and is urged for the first time on appeal. It is well settled that objections to instructions not called to the trial court's attention may not be urged on review. *People v. Abrams* (1971), 48 Ill. 2d 446, 271 N.E.2d 37; *People v. Hill* (1975), 34 Ill. App. 3d 193, 339 N.E.2d 405; *People v. Dauphin* (1964), 53 Ill. App. 2d 433, 203 N.E.2d 166.

■■ Defendant's objection to the motive instruction both at trial and in his motion for a new trial was that the instruction request was granted in an untimely fashion. After defense counsel had completed his closing argument the State requested that the motive instruction be added to the instructions to be given the jury, which request was granted. Defendant does not urge this ground for objection before this court, and as such we are not required to consider it. Points not argued or briefed on appeal are

waived. (Ill. Rev. Stat. 1973, ch. 110A, par. 341(e)(7); see, *e.g., People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92, *cert. denied,* 419 U.S. 1111 (1975); *People v. Adams* (1969), 113 Ill. App. 2d 276, 252 N.E.2d 65.) We would note, however, that section 67(3) of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 67(3)), made applicable to criminal prosecutions by Supreme Court Rule 451(c) (Ill. Rev. Stat. 1973, ch. 110A, par. 451(c)), makes explicit provision for a further conference on instructions "[i]f as a result of the arguments to the jury the court determines that additional instructions are desirable * * *." In the instant case, a conference was held outside the jury's presence on the request for addition of the motive instruction, and the trial court properly granted the request based on its specific finding that "counsel for the defense in his arguments argued the motive."

Defendant's final contention is that the 30-60 years sentence imposed was excessive. Murder is a separate class felony for which a penitentiary sentence for an indeterminate term of not less than 14 years is provided. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1(b).) The Unified Code of Corrections provides that the maximum term for murder shall be any term in excess of 14 years (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(b)(1)), and the minimum term shall be 14 years unless the court, having regard to the nature and circumstances of the offense and the history and character of the defendant, sets a higher minimum term (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1(c)(1)). The sentence here is within the limits set by the Code, and the record reflects that the trial judge did consider both defendant's prior criminal record and the nature of the offense in imposing the sentence.

Defendant claims that the court did not adequately consider "the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, § 11.) In support of this contention defendant points to his age, 63 years, at the time of sentencing. We have recently disposed of a similar claim in relation to a sentence of 75-150 years in *People v. Luckey* (1975), 35 Ill. App. 3d 179, 182, 341 N.E.2d 112, 114:

> "In further support of his contention that his sentence should be reduced, defendant asserts that it exceeds his probable life expectancy and is thus not indeterminate as required by the Unified Code of Corrections. [Citation.] We reject this contention, noting that the sentence imposed is both authorized by statute [citation] and comparable to sentences upheld for other murders. [Citations.] We further note that defendant is not deprived of his opportunity for parole by the sentence, as he argues here. Under * * * administrative regulation No. 813 of the Department of Corrections, Adult Division, good behavior could result in his eligibility for parole within 11 years, 3 months."

Similarly, defendant in the instant case could be eligible for parole in 11 years, 3 months, at the age of 75. There was no evidence that defendant has no reasonable expectation of reaching such age. In this regard, we find defendant's reliance upon the State's recommendation of 20-40 years misplaced, since under such a sentence defendant would still only be eligible for parole in a minimum of 11 years, 3 months. (Ill. Rev. Stat. 1973, ch. 38, par. 1003—3—3(a)(1), and Ill. Dep't of Corrections, Adult Division, Adm. Reg. No. 813 (April 16, 1976).) In addition, we note that defendant's past criminal history does not reveal high rehabilitative potential. In 1951 he was convicted of three counts of armed robbery, in 1953 he was convicted of forgery, and in 1958 he was again convicted of three counts of armed robbery. Since his release in 1963 he has had various convictions on gambling charges stemming from card games he organized and patronized.

■■ The power of reviewing courts to reduce sentences (Ill. Rev. Stat. 1973, ch. 110A, par. 615(b)(4)) should be applied with considerable caution and circumspection since the trial judge ordinarily has a superior opportunity in the course of the trial and the hearing in aggravation and mitigation to make a sound determination as to the punishment to be imposed. (*People v. Fox* (1971), 48 Ill. 2d 239, 269 N.E.2d 720; *People v. Stephens* (1974), 18 Ill. App. 3d 971, 310 N.E.2d 824.) The power is limited in use to those instances where the punishment imposed is at variance with the fundamental spirit of our laws, or is disproportionate to the offense. (*People v. Smith* (1958), 14 Ill. 2d 95, 150 N.E.2d 815; *People v. Huggy* (1974), 19 Ill. App. 3d 247, 311 N.E.2d 355.) Absent a clear showing of abuse of discretion, the sentence imposed by the trial court will not be disturbed on review. (*People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied*, 412 U.S. 951 (1973); *People v. Hanserd* (1970), 125 Ill. App. 2d 465, 261 N.E.2d 317.) In the instant case, in view of defendant's criminal record, and considering the nature and circumstances of the offense, we cannot say that the trial court abused its discretion in its determination of sentence. We therefore conclude that this is not a proper case in which to exercise our power to reduce sentence.

For all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.