THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
FAITH MOORE *et al.*, Defendants-Appellants.

Second District   No. 76-137

Opinion filed July 26, 1977.

Ralph Ruebner and Michael Mulder, both of State Appellate Defender's Office, of Elgin, for appellants.

Jack Hoogasian, State's Attorney, of Waukegan (Phyllis J. Perko and Martin P. Moltz, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE RECHENMACHER delivered the opinion of the court:

The defendants were convicted of armed robbery after a jury trial. Defendant Jay Brown was sentenced to a term of 6 to 18 years in the penitentiary, and defendant Faith Moore was sentenced to a term of 4 to 6 years. Both defendants appeal, contending that the evidence presented by the prosecution was insufficient to prove their guilt beyond a reasonable doubt. Jay Brown further contends that his sentence was excessive and not justified by the "nature and circumstances" of the offense.

The State's case was based upon the eyewitness identification of the defendants by Donna Langley, who was 16 years old, and employed by the Kentucky Fried Chicken Restaurant in Zion, Illinois, as a sales-hostess. Miss Langley was on duty on May 13, 1975, at a few minutes past 8 p.m. when a black man and woman entered the restaurant. The woman ordered a soft drink while the man went to the side of the counter. Miss Langley served the woman, and took the man's order. The woman gave Miss Langley a $5 bill, and Miss Langley rang her order up on the cash register. After the register opened, she saw that the man had a small, silver gun. The man said, "Don't scream or say anything or else I'll kill you," and reached over the counter and took all of the bills from the cash register. The couple then ran out of the restaurant together.

Miss Langley described the male offender as five feet ten inches to six feet tall, between 24 and 26 years old, and weighing about 240 pounds. He was described as wearing a "fishing hat" with the brim turned down, reaching to the bottom of his forehead, as well as sunglasses. Miss Langley testified at trial that the man "had a normal mustache and maybe he could have been starting to grow a beard or sideburns or goatee." The woman was described as a "light-skinned" Negro with her hair pinned to her head with barrettes, weighing 110 to 115 pounds, 19 to 20 years old, wearing a "baby blue" jacket of mid-thigh length. Miss Langley told police after the robbery that she was sure that she could identify the female and "almost sure" she could identify the male.

That same night, she went to the Zion Police Station, and was shown approximately two to three hundred photos of both male and female subjects, but was unable to identify any of them. The next day she returned to the station where she assisted in the preparation of a composite sketch of the male offender, and was then shown five or six photos of different subjects. She picked the photograph of Jay Brown out of the six, saying it "looks like" the offender, except that the subject in the photographs was dressed differently than the offender, and had a beard.

On the following Saturday, Miss Langley viewed a lineup of six subjects, including Jay Brown. She was given a sheet of paper with the number of each subject on it, and circled the number corresponding to

Brown; however, she added the comment "not positively though" on the sheet.

At the preliminary hearing, Miss Langley made a positive identification of Jay Brown and Faith Moore. She testified that she had not been certain of her identification at the police lineup, because Brown was dressed differently than the offender.

Miss Langley also made a positive identification of both offenders at trial. There, she testified that she had failed to make a positive identification at the lineup because Jay Brown "didn't look quite the same" without his hat and glasses and with different clothes, that she didn't have her glasses or contacts on when she viewed the lineup and that Brown "wasn't just a couple of inches away * * * like he was standing across the counter." On cross-examination she stated it would not have made any difference as to whether or not she was wearing glasses when she viewed the lineup.

Certain circumstantial evidence was presented by the State in support of Miss Langley's testimony. David Dorn, the assistant manager of the restaurant, testified that, at the time of the robbery, he was checking the parking lot for garbage when he observed a black couple running from the restaurant, heading in the direction of the nearby Colonial Bakery. Mr. Dorn observed that the black female was wearing a waist length blue jacket, but was unable to make any identification of the pair. Robert Brown, who lived near the Colonial Bakery, testified that when he arrived home at approximately 8 p.m. on May 13, he observed a rusted, older model Ford automobile of a "peculiar bluish green color" backed into the bakery parking lot in an unusual manner. He testified that three small black children were jumping up and down on the rear seat of the car, and that the car pulled away after about three minutes. He stated that on the next night, two police detectives took him to 2717 Galilee in Zion, Illinois, where he observed the Ford which he had seen on the night of the robbery, parked by an apartment building at that address. Margie Moore, Faith Moore's sister, was called by the State and testified that Jay Brown was her sister's boy friend and that her sister had three children. She further testified that her sister came to her home and asked to borrow her car, a blue-green or turquoise 1964 Ford, which had rust on it, on the night of the robbery. Her sister borrowed the car at between 6 and 6:30 and returned it between 8 and 9. Jay Brown and her three children were with her when she returned the car; Faith Moore was wearing a blue coat and Brown was wearing a blue hat with a brim in front. Margie Moore testified that she lived at 2717 Galilee in Zion, Illinois.

Jay Brown testified that on the night in question he played pool at his home with his brother and Lee Jones. At 6 o'clock or 6:30 p.m., Faith Moore left to borrow her sister's car, in order to do some errands. She

returned and at 7 o'clock or 7:30, the pair and Faith Moore's three children left Brown's home and drove to North Chicago, where they arrived after 15 to 20 minutes. There Brown borrowed his cousin's car and followed Faith Moore to Margie Moore's home, where she returned Margie Moore's car. Faith Moore also took the stand, corroborating Jay Brown's alibi testimony.

The defense called a number of further witnesses. Carole Brewer testified that although she was working in the back of the restaurant on the night of the robbery, and saw a black couple come into the store, she was unable to identify them or recall what they were wearing. Lee Jones testified stating that he had followed the defendants after they had left Moore's house and had last seen them heading toward North Chicago at 7:30 or 8 o'clock. Jones testified that he was currently serving time for robbery. Other defense witnesses established that the automobile which Margie Moore had loaned Faith Moore had subsequently been scrapped and that sometime after the auto was scrapped, an investigator from the public defender's office photographed a similar car about one block from Faith Moore's apartment. Although the photo of the car was not admitted into evidence, it was shown to Donald Graves, a former owner of Margie Moore's car, who lives with Margie Moore. Graves testified that the car in the photo was the same car that he used to own.

The defendants' argument in sum is that the identification testimony of Donna Langley was unreliable and insufficient to form the basis for a conviction, since the "male robber wore clothes which concealed rather than disclosed his identity," and Miss Langley "would have no incentive to carefully observe her patrons until the moment the male threatened her." They argue that the "uncertainty" was evidenced by the inaccuracies in Miss Langley's description of the offenders and her inability to make a positive identification after viewing photos and the lineup, and reinforced by what they contend were unfairly suggestive identification procedures. They assert that the State's circumstantial evidence was "unsatisfactory" and inconclusive and that the jury was thus not justified in "ignoring" the defendants' "uncontradicted alibi evidence."

■■ We begin by noting that a positive and credible identification of a defendant by a single witness is sufficient to convict, even though it may be contradicted by the alibi testimony of the defendant. (*E.g., People v. Jones* (1975), 60 Ill. 2d 300, 308; *People v. Stringer* (1972), 52 Ill. 2d 564, 568-69; *People v. Speck* (1968), 41 Ill. 2d 177, 194-95.) Here Miss Langley was a witness who had the opportunity to observe the defendants for four or five minutes at close quarters in a well-lighted restaurant. The defendants' argument that Miss Langley was so preoccupied that she failed to closely observe the offenders before the announcement of the robbery, and was then so upset by seeing the gun that she was not capable

of careful observation afterward, finds no support in the record. Similarly, there is nothing to indicate that the male offender's hat and glasses so obscured his face as to render his identity unrecognizable, and the composite sketch which Miss Langley assisted in preparing, and which was admitted into evidence, would seem to indicate the contrary. Instead, the record presents a credible eyewitness who had an excellent opportunity to observe the offenders.

We also disagree with the defendants' contention that errors and inconsistencies in Miss Langley's description of the offenders negates the value of her testimony. The defendants note that she described the male offender as five feet ten inches to six feet tall, and weighing 240 pounds, while it was undisputed that Jay Brown was only five feet nine inches tall and weighed about 180 pounds. They further note that although Miss Langley said that the offender was "maybe * * * starting to grow a beard or sideburns or goatee," she failed to include a beard or goatee in the composite drawing, and told the police that the offender did not have a beard when she picked Jay Brown's photo from the group of photos that was shown her. They argue that her identification of Faith Moore was also erroneous, since she described the blue jacket as mid-length, while other witnesses stated that it was waist length. They assert that although Miss Langley testified that the female offender had her hair pinned closely to her head in braids, with barrettes, and the arresting officer, Ronald Ransom, indicated that Faith Moore had her hair in barrettes at the time of her arrest, in view of Margie Moore's testimony that Faith had not worn her hair in braids since sixth grade, Miss Langley's testimony on this point was "unconvincing," since "[i]t is incredible that one would braid her hair in order to conceal her identity during the robbery."

■■ It is unnecessary for us to deal with these points in any detail, although we note in passing that there is nothing "incredible" about the concept of a female offender braiding her hair in order to conceal her identity. Precise accuracy in describing facial or other characteristics is unnecessary where an identification is positive. (*People v. Catlett* (1971), 48 Ill. 2d 56, 63; *People v. Miller* (1964), 30 Ill. 2d 110, 113.) In *People v. Nichols* (1975), 32 Ill. App. 3d 265, 268, for an example, the court stated that:

> "The significant issue * * * is not whether there is a discrepancy between the victim's estimate and the actual height, but whether, under the facts and circumstances * * * 'an adequate opportunity for a definite identification' existed."

(See also *People v. Chatman* (1975), 32 Ill. App. 3d 506, 510 (discrepancy of 60 to 65 pounds, coupled with discrepancies regarding offender's height and age, held not to destroy credibility of eyewitness); *People v. Rogers* (1975), 32 Ill. App. 3d 788, 790 (witness's failure to notice a thin

goatee, description of glasses as dark-rimmed, rather than wire-rimmed, and of coat as dark brown, whereas other witnesses described it as light brown, held not to raise reasonable doubt); *People v. Winston* (1975), 28 Ill. App. 3d 237, 239 (fact that witness could not remember whether robber had a mustache held to go only to credibility); *People v. Lumpkin* (1975), 28 Ill. App. 3d 710 (failure of witnesses to notice prominent scar on defendant's face held not to invalidate identification).) As the court noted in *Winston*, an identification is usually not made by distinguishing separate features but by the "total impression" made upon the witness (28 Ill. App. 3d 237, 239); therefore, omissions or discrepancies in descriptions, such as those in the case at bar, where Miss Langley had an excellent opportunity to observe the offenders for "four or five minutes", go only to the weight of the evidence. See *In re Winslow* (1977), 46 Ill. App. 3d 962, 967; *People v. Owens* (1977), 46 Ill. App. 3d 978, 988.

Similar rules apply to the failure of Miss Langley to make a positive identification prior to the preliminary hearing; in general, the failure of a witness to make a positive identification at a lineup is but a factor to be considered in weighing the testimony of the identification witness. (See *People v. Evans* (1976), 42 Ill. App. 3d 902, 910; *People v. DeMorrow* (1974), 17 Ill. App. 3d 901, 909-10, *aff'd*, 59 Ill. 2d 352.) Further, we observe that Miss Langley's initial identification of Faith Moore at the preliminary hearing was positive.

■■ The defendants' argument that Miss Langley's testimony was tainted and invalidated by unfairly suggestive pretrial identification procedures is also without merit. This court has examined the record, and is convinced that the pretrial identification procedures were not unfairly suggestive. In regard to Faith Moore, we note that there is no requirement for a lineup to be held in every case (*People v. Moore* (1974), 17 Ill. App. 3d 507, 510), and there was nothing unfairly suggestive about the procedure employed at the preliminary hearing. As to Jay Brown, we have examined the photo of the lineup and the six photos Miss Langley viewed at the police station, which are part of the record on appeal, and find nothing unfair about them, there being no requirement that all of the men in the lineup be physically identical. *People v. Owens* (1977), 46 Ill. App. 3d 978, 991, and cases cited therein.

The defendants have argued that since Jay Brown was the only person in the six photos which were shown Miss Langley, who was also in the lineup, an identification of Brown was "almost inevitable," and therefore unfair, citing *Foster v. California* (1969), 394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127. *Foster* is not on point since it involved not a photo identification followed by a lineup, but rather, a suggestive lineup, followed by a one-on-one confrontation between the accused and the witness, followed by a second lineup, with the accused being the only

person appearing in both lineups. We know of no case which would invalidate the identification procedure employed here. See *People v. Owens* (1977), 46 Ill. App. 3d 978 (among lineup participants, only defendant's picture had previously been displayed to eyewitness; affirmed).

Even assuming arguendo that the pretrial identification procedures employed in the instant case were unfairly suggestive, the validity of Miss Langley's identification of the defendants, both at the preliminary hearing and at trial, would be unaffected, since the identification at the trial clearly had an origin independent from the pretrial procedures. (*People v. McDonald* (1975), 62 Ill. 2d 448, 453-55; *People v. Connolly* (1973), 55 Ill. 2d 421, 427.) The failure of Miss Langley's co-worker, Carole Brewer, to identify the defendants is of no particular importance or relevance. (*People v. Owens* (1977), 46 Ill. App. 3d 978, 989-90.) The circumstantial evidence presented by the State provided considerable support for Miss Langley's version of the event, and the defendants themselves admitted that, at the time of the offense, they were riding in an old car with three children, similar to the car and children described by witness Robert Brown. The defendants' alibi testimony presented but a counterproposition to the testimony of Miss Langley, and was thus an issue of fact for the jury to resolve. A court of review cannot substitute its judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses, and cannot reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*E.g., People v. Stringer* (1972), 52 Ill. 2d 564, 568-69.) Here it is clear that the jury chose to believe Miss Langley and disbelieve the testimony of the defendants, and there is nothing so improbable about this finding as would justify our disturbing the verdict.

Finally, Jay Brown argues that his sentence of 6 to 18 years is excessive, since none of the persons involved in the robbery were injured or even touched, the robber obtained a mere 50 to 60 dollars, and the three children which he and his "common law wife" (co-defendant Faith Moore) have had "will suffer in growing up without their father."

■■ The imposition of sentence is a matter of judicial discretion, and the sentence imposed by the trial court will be disturbed only where there has been a manifest abuse of that discretion. (*E.g., People v. Limas* (1977), 45 Ill. App. 3d 643, 652.) Here, Jay Brown had a prior burglary conviction, and multiple convictions for shoplifting and other offenses. The probation officer's presentence report expressed the opinion "* * * that no matter what [sentence] the court may give the defendant, he will be in future trouble with the law, because of his present attitude." The fact that the defendant only obtained 50 to 60 dollars is clearly irrelevant, and the contention that the defendant's children will suffer if they grow

up without their father is highly questionable. The quality of the parental influence of a father who would take his children along on an armed robbery is dubious, at best. On this record, the trial judge could properly have found that both the defendants' children and society would be better off if deprived of Jay Brown's presence for a considerable span of time; there was thus no abuse of the trial court's sentencing discretion.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Judgment affirmed.

SEIDENFELD and BOYLE, JJ., concur.