THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RICKY R. DAVIS, Defendant-Appellant.

First District (5th Division)    No. 76-1359

Opinion filed September 30, 1977.

James J. Doherty, Public Defender, of Chicago (Gail A. Moreland, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Kenneth McCurry, and James Marcanti, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial defendant was found guilty of armed robbery and sentenced to serve 4 to 6 years in the penitentiary. On appeal defendant contends that he was not proved guilty beyond a reasonable doubt and that defense counsel was incompetent. We affirm.

Fred Thompson testified at trial that on July 22, 1974, he entered a tavern known as Skip's Rendezvous sometime between 10:30 p.m. and 10:45 p.m., selected a bar stool near a television and ordered a bottle of beer. At approximately 10:50 p.m. a short black man entered the tavern with a gun, assumed a crouching position and announced a stickup. Two more black men with guns came in immediately after the first. The first gunman instructed the second man to enter the tavern to "take" Thompson and the third man to "take" the other customers. The second gunman approached Thompson and moved behind him. Thompson had turned on his stool toward the door when the first gunman came in and he observed the second gunman's face as he approached. The second gunman poked Thompson in the back with the gun he held and told him to put his hands on the bar and stand up. Thompson followed these instructions. The gunman stood behind Thompson and went through his pockets. Thompson turned around while his pockets were being rifled and asked the gunman to return his driver's license. The gunman told Thompson to turn around and shut up and jabbed him with the gun. When the robber proceeded to take Thompson's keys, Thompson turned around and told his assailant that he needed his keys to get into his house. The robber told Thompson that he did not need his keys, again poked him in the back with the gun and told him to turn around, shut up and quit looking at him. The victim did so but then turned back around and said: "* * * what do you mean, I am not looking at you." Thompson explained at trial that: "* * * I turned around intentionally so I could study him a little more carefully because I thought he was going to shoot me." The

robber responded: "Shut your mouth or I will blast you." Then the robber spoke to one of the other gunmen. Thompson thought his assailant was asking what time it was. He turned around, said it was exactly 10:55 p.m., looked closely at the robber's face and studied it. The robber then ordered Thompson into the tavern's washroom. At first Thompson refused to move but when the robber repeatedly poked him in the back with the gun with increasing force Thompson did as instructed. The bartender, Thompson and the other customers all entered the washroom and remained there for approximately five minutes. Then they exited and the bartender called the police. Thompson further testified that the lighting in the tavern at the time of the robbery was quite good. He explained that several neon signs in the tavern's windows, a cigarette machine and the television, which was on at the time, combined to provide quite a bit of light in the area he was in. He added that this area was the most highly lit area in the bar. He also identified defendant as his assailant and described his gun as either a .32 or a .38 caliber, snub-nosed revolver.

On cross-examination Thompson testified that he forgot to mention earlier that there were ceiling lights on in the tavern during the robbery and that one was located over the area where he sat. The robber stood between one and two feet behind him during the robbery. Thompson observed his face for a total of approximately 25 to 30 seconds. The first time he saw defendant after the robbery was approximately two weeks thereafter in a lineup at a police station. He identified defendant as his assailant at that time. The men in the lineup answered questions asked by the officer conducting the lineup. Thompson heard defendant speak but he did not positively identify defendant by his voice alone. Instead, he recognized defendant's face and noted that his voice was exactly the same as that of his assailant.

On redirect examination Thompson recalled that he had testified at a preliminary hearing. He confirmed his testimony at the hearing that he observed defendant's face for about three or four seconds as the defendant first approached him. Subsequently, he turned around and studied defendant's face five times for a period of four or five seconds each time. He confirmed his preliminary hearing testimony that he twisted his body around each time he looked back at his assailant and did not simply turn his head on those occasions. He added that one preliminary hearing answer indicating that he had turned for only two seconds each time was not the answer he had given at the hearing.

James Smith testified at trial that he was tending bar at Skip's Rendezvous at approximately 10:45 p.m. on July 22, 1974, when the tavern's front door suddenly opened and a black man with a gun entered, assumed a crouching position and announced a stickup. Smith, who had

been sitting on a stool behind the bar, stood up, turned around and faced the wall behind him. As he turned around he saw the gunman and glimpsed two other men coming in the door. During this glimpse he noticed that the other men were black and wore dark clothing. He also both heard and saw the first gunman direct the second man to enter the tavern to "take" Fred Thompson and the third man to "take" some other customers. Then the first gunman searched him, took his wallet and took money from another pocket. Smith did not see what the other gunmen were doing while he was being robbed. The first gunman ordered the other two robbers to take the customers into the women's washroom and then directed Smith to get a paper bag and put the cash register's currency into it. The gunman kept his hand on Smith's shoulder and his gun in Smith's back as Smith went to the rear of the tavern and secured a bag. Smith did not see the other robbers or the customers during this trip. Still with the robber's gun in his back and hand on his shoulder, Smith returned to the cash register. During his return he glimpsed the other robbers and the customers moving toward the washroom. Smith put all of the folding money in the bag and the robber took all of the change from the cash register's drawer. Then Smith was led to the washroom, pushed inside and told not to come out for five minutes. Four or five minutes later he came out and called the police. He never identified the other two robbers.

During Smith's cross-examination the State stipulated that Smith never identified defendant as one of the robbers and could not do so at trial.

Chicago police officer John Dorn testified at trial that he was a gang crimes investigator and had held this position since 1973. His only additional testimony on direct examination was that he arrested the defendant two weeks after the robbery.

On cross-examination Investigator Dorn testified that he had neither seen nor known the defendant prior to the arrest. Additionally, the investigator had never known defendant to be a member of a gang prior to the arrest. However, he did know prior to the arrest that defendant associated with people who were affiliated with gangs. At the time of the arrest Investigator Dorn was conducting an investigation into a series of tavern robberies. Two days prior to defendant's arrest a man was murdered during such a robbery and one of the defendant's associates had been identified as a participant in that robbery. Upon checking the prior arrest record of this individual it was discovered that defendant had been arrested with him approximately five months prior to this armed robbery. Through the investigation it was learned that defendant's parents owned a car that was similar to the one used in this robbery and defendant's general description fit the description of the tavern robbers under investigation. For these reasons the investigator thought defendant

might be involved in the July 22, 1974, robbery. The investigator talked to defendant's mother when he went to defendant's home and she indicated that defendant was home on the night in question and on every evening for a week prior to the evening of July 22, 1974.

On redirect examination the investigator admitted that he never determined that defendant was involved in a tavern homicide. Victims and witnesses of numerous tavern armed robberies were contacted as part of the investigation of a tavern homicide. Victims from these numerous tavern robberies were brought in to view lineups and that is how Fred Thompson came to view the lineup in which defendant participated.

Mrs. Elizabeth Davis, defendant's mother, testified at trial that defendant lives with her and her husband in the family's home. July 22 is her oldest daughter's birthday and on July 22, 1974, a birthday party was held for her at the Davis residence. For a week prior to the party defendant helped to prepare the home for the celebration by cleaning and painting portions of it. The party started around 8:30 p.m. or 9 p.m. and defendant was there at that time. It lasted until 2 a.m. or 2:30 a.m. the next morning. Defendant never left the party. Also, he was never permitted to use the family car prior to or on July 22, 1974, as he did not have a driver's license until 1975 and Mrs. Davis and her husband would not let him use the car before he obtained his license. Defendant was required to be home by 10 p.m. every evening and he was home by that time throughout the month of July 1974.

On cross-examination Mrs. Davis testified that about 25 people attended the party and repeated that defendant was at the party from 8:30 p.m. to 2 a.m. She had him in sight the entire evening.

Defendant testified at trial that he was a high school student on July 22, 1974, that he had always been required to be home by 10 p.m. and that he had always observed that curfew. He never belonged to any gangs, never saw Fred Thompson before the line-up and never had a gun in his hand except during ROTC training in high school. He first applied for and received his driver's license in 1975. The first time he drove a car was also in 1975 but it was not the family car. His parents never let him drive the family car. He denied ever being near the tavern where Fred Thompson was robbed.

On cross-examination defendant testified that he did not attend school during the summer of 1974. He repeated that he never held a gun except in ROTC and that he had never seen Fred Thompson prior to the lineup. At 11 p.m. on July 22, 1974, he was at home attending his sister's birthday party. That party started around 8:30 p.m. and ended around 2:30 a.m. the next morning. During the day of the party he worked on the house, painting the basement and the outside of the house. He had been painting

for about a week prior to that time in preparation for the party. He was home by 10 p.m. every night of the week. At the preliminary hearing he testified that his mother had made him stay home every day during the week prior to the party after he came home from school. At trial he did not remember if he went to school at all in the summer of 1974, but he lied to his mother when he told her he was going to school that week. In fact, he went to his girl friend's house that week. However, he remembered exactly where he was at 11 p.m. on July 22, 1974, and he did attend summer school after that date.

On redirect examination defendant testified that his schooling was interrupted by the police. They were investigating an incident at a party he attended. As a result of the incident all of the boys at the party were temporarily held by the police but he was released and not charged. As a result of this investigation he was unable to attend school and his school program was interrupted. At a later date he returned to school.

On recross-examination defendant again admitted that he lied to his mother when he told her he was going to school and stated that he was actually seeing some girls. He did attend school during the summer of 1974 but his school was interrupted by his arrest for the July 22 robbery on August 6, 1974, and before that by the police investigation of a murder at a party he attended. He was taken into custody during this investigation but was not charged with the murder. He was released but thereafter the police, who thought he was an active gang member, stopped him on his way to school two or three times a week, took him to the station and asked him questions. As a result he would miss school those days and his grades consequently suffered. Later in the summer he returned to school.

On redirect examination defendant testified that two boys had busted into a party he attended earlier in 1974 and shot another boy in the head. The victim subsequently died. Afterwards defendant was continuously interrogated and these interrogations disrupted his schooling.

Chicago police officer Dennis McCarthy testified in rebuttal that on January 31, 1974, he arrested defendant at approximately 9:30 p.m. He searched defendant at that time and found a .22 caliber revolver in his waistband. Defendant was not wearing an ROTC uniform that night.

On cross-examination Officer McCarthy testified that the gun he found on defendant was not a toy gun—it was an inoperable real gun. At the time of the arrest defendant told the officer that he found the gun in an alley. The case against defendant for possession of this gun was subsequently dismissed.

On redirect examination the officer repeated that the gun was not a toy gun. Instead it was a real gun that would not fire.

The defendant testified in surrebuttal that Officer McCarthy stopped him by a Jewel food store. Defendant and his little brother had gone to

this store at their mother's request. Defendant found the gun in back of the store. He picked it up and then the police arrived.

On cross-examination defendant testified that he thought the gun he found was a toy gun because it was very small. In fact, he thought it was a cap gun.

OPINION

The first issue raised on appeal is whether defendant was proved guilty beyond a reasonable doubt.

■■ ■ Defendant argues that Fred Thompson had only a limited opportunity to observe his assailant and consequently his identification is too doubtful to support the conviction. We disagree. Thompson testified that he observed his assailant's face for three or four seconds as the robber first approached him. Subsequently Thompson studied the robber's face for four or five seconds on at least four separate occasions from a distance of only one or two feet. Thompson further testified the lighting was quite good. He explained that several neon signs, a cigarette machine, a television and ceiling lights were sources of light at the time of the robbery. One of the ceiling lights was located over the area where he sat. It is the function of the trier of fact to determine the credibility of the witnesses, the weight to be afforded their testimony and the inferences to be drawn from the evidence, including an inference concerning the adequacy of the victim's opportunity to observe his assailant, and a reviewing court should not substitute its judgment for that of the trier of fact unless the evidence is so unsatisfactory, improbable or implausible as to justify a reasonable doubt of a defendant's guilt. (See *People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733; *People v. Zuniga* (1973), 53 Ill. 2d 550, 559, 293 N.E.2d 595; *People v. Givens* (1977), 46 Ill. App. 3d 1035, 1043, 361 N.E.2d 671.) We find ample evidence in the record to support this jury's determination that the victim had an adequate opportunity to observe his assailant.

Furthermore, Thompson first identified defendant as his assailant at a lineup held approximately two weeks after the robbery occurred. At trial defendant sat between two black males in the front row of the courtroom's spectator seats during the first portion of Thompson's direct testimony. While defendant was so situated, Thompson was asked to look around the courtroom and identify his assailant. Thompson identified defendant as the assailant at that time. The last time Thompson had seen defendant prior to trial was at a preliminary hearing in August 1974. Trial was held in May 1976. Positive identification testimony of a victim who is credible and who had an adequate opportunity to observe his assailant is sufficient to establish guilt beyond a reasonable doubt even if the testimony is contradicted by the accused. See *People v. Williams* (1975),

60 Ill. 2d 1, 12, 322 N.E.2d 819; *People v. Novotny* (1968), 41 Ill. 2d 401, 411, 244 N.E.2d 182.

■■ Defendant also asserts that his alibi defense was neither contradicted nor impeached. Defendant's mother testified that defendant was home at the time of the robbery in question. On the other hand, the victim of the robbery positively identified defendant as the robber both during a lineup and later at trial. Also, the victim's opportunity to observe defendant was adequate. The whereabouts of defendant at the time of the crime is a matter for the jury's determination. It follows that the credibility and weight to be given the testimony of defendant's alibi witness is a matter for the jury's determination. That determination will not be disturbed unless palpably erroneous. (See *People v. Gardner* (1966), 35 Ill. 2d 564, 571, 221 N.E.2d 232; *People v. Ostrand* (1966), 35 Ill. 2d 520, 532-33, 221 N.E.2d 499.) We do not find the jury's determination in the instant case to be palpably erroneous.

Defendant further asserts that the testimony linking defendant to other armed robberies and murders substantially prejudiced defendant and led to his conviction.

The sources of testimony linking defendant to other armed robberies and murders were Investigator Dorn and the defendant himself. On cross-examination by defense counsel the investigator testified that he knew defendant associated with people who were affiliated with gangs prior to his arrest of defendant. He explained, in response to defense counsel's question, that he thought defendant might be involved in the July 22, 1974, robbery because: one of defendant's associates had been identified as a participant in a robbery involving a murder; it was discovered that defendant had been arrested with this associate approximately five months prior to the robbery involving the murder; defendant's parents owned a car that was similar to the one used in this robbery; and defendant's general description fit the description of one of the tavern robbers under investigation. On redirect examination the investigator explained that defendant was never found to be involved in a tavern homicide, that victims and witnesses of numerous tavern armed robberies were contacted as part of the investigation of a tavern homicide and that Fred Thompson was brought in to view the lineup in which defendant participated because he was a victim in the July 22, 1974, robbery. Defendant, on redirect examination by defense counsel, testified that his schooling was interrupted by a police investigation of an incident at a party he attended. On re-cross-examination defendant testified that his schooling was interrupted both by his arrest for the July 22, 1974, robbery and the police investigation of a murder at the party he attended. Then on redirect examination by his counsel defendant explained how the murder at the party had taken place.

■■ It is obvious from a review of the testimony complained of that defense counsel initiated the line of inquiry into other crimes during both Investigator Dorn's testimony and defendant's testimony. It is clear from the record that defense counsel did so for tactical reasons. A defendant cannot be heard to complain of the testimony which was invited by his own tactics at trial. (See *People v. Bell* (1972), 53 Ill. 2d 122, 127, 290 N.E.2d 214; *People v. Barksdale* (1974), 24 Ill. App. 3d 489, 499, 321 N.E.2d 489.) Also, if a defendant procures, invites, or acquiesces in the admission of evidence, even though it be improper, he cannot complain. See *People v. Burage* (1961), 23 Ill. 2d 280, 283, 178 N.E.2d 389, *cert. denied* (1962), 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651; *People v. Stephens* (1974), 18 Ill. App. 3d 971, 977, 310 N.E.2d 824.

The second issue raised on appeal is whether defense counsel was incompetent. As evidence of his incompetency defendant advances only the questions counsel asked of Investigator Dorn on cross-examination whose answers linked defendant to other tavern armed robberies and a murder.

■■■ Defense counsel objected and requested a side bar shortly after Investigator Dorn's direct examination began. Defense counsel expressed great concern at this time over the possibility that this arresting officer's testimony that he was a gang crimes investigator would cause the jury to believe defendant was a crime gang member. On cross-examination defense counsel strove to establish that defendant was not a member of any gang. In the course of this cross-examination the investigator testified in effect that defendant had friends who were gang members, that one of these friends had been identified as one of the robbers in a robbery involving a murder, that defendant had once been arrested with this friend, that defendant's general description fit the description of one of those robbers and that defendant's parents owned a car which was similar to the one used in that robbery. Whether defense counsel should have been as concerned as he was over the possibility of the jury believing that defendant was a gang member and whether he should have pressed his questioning as he did was a matter of trial tactics, discretion and judgment and such matters cannot serve as a basis for establishing the incompetency of counsel. (See *People v. Clark* (1977), 47 Ill. App. 3d 624, 629, 365 N.E.2d 20.) Moreover, the question over the competency of counsel must be resolved on a case by case basis after a careful review of all facts and circumstances. (See *Clark*, 47 Ill. App. 3d 624, 630.) In the instant case defense counsel cleverly arranged to have defendant seated in the trial's audience between two black males during Fred Thompson's identification. Later, his persuasive argument led to the stipulation that Smith could not identify defendant. He subsequently presented an alibi defense. He effectively stated defendant's position during his opening

statement. In closing he made a thorough and highly professional argument, advancing all circumstances which could possibly raise a reasonable doubt of defendant's guilt. It is against this background that defendant advances a handful of questions defense counsel asked during cross-examination of the arresting officer. Based on this record we cannot say that the actions complained of reduced the trial to a farce (see *People v. Hawkins* (1974), 23 Ill. App. 3d 758, 760, 320 N.E.2d 90), or that defendant met his burden of clearly establishing that defense counsel's manner of carrying out his duties as a trial attorney reflects incompetence (see *People v. Stepheny* (1970), 46 Ill. 2d 153, 157, 263 N.E.2d 83; *Clark*).

Accordingly, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.