THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ALEXANDER GONZALES, Defendant-Appellant.

First District (5th Division)   No. 77-913

Opinion filed May 12, 1978.

Julius Lucius Echeles, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial defendant, Alexander Gonzales, was found guilty of the crimes of rape, deviate sexual assault, and aggravated kidnapping (two counts). The court sentenced him to serve concurrent terms of 35 to 55 years each for rape and deviate sexual assault. The court further entered a single judgment on the verdicts as to the two counts of aggravated kidnapping and sentenced defendant thereon to one term of 4 to 12 years, to be served concurrently with the sentences for rape and deviate sexual assault.

On appeal defendant contends that: (1) he was not proven guilty beyond a reasonable doubt; (2) he was denied a fair trial by the State's introduction of evidence of other crimes; (3) he was compelled to forego his right to remain silent by the State's improper use of evidence of other crimes; and (4) he was denied a fair trial by the prosecutor's prejudicial comments during closing argument. We affirm. The pertinent facts follow.

Prior to trial, the defendant filed a written motion *in limine,* requesting that the State be precluded from introducing evidence of other crimes allegedly committed by defendant. On June 18, 1976, following an offer of proof by the State's Attorney, the trial court denied defendant's motion. In so doing, the court reasoned that the offer of proof had demonstrated sufficient similarities as to identity, intent, and *modus operandi* between the other alleged crimes and the incident in question so as to allow evidence of these other crimes to be admitted at trial.

At trial, the prosecutrix testified that on March 29, 1974, she was 22 years old and worked as an X-ray technologist from 4 p.m.' to 12 midnight. After work she received a ride to Elston and Paulina Avenues, arriving at 12:30 a.m. She began walking toward her home in the 3400 block of West Belle Plaine, which was eight blocks away.

As she neared 3619 West Belle Plaine, the prosecutrix was approached by a man. He placed a moon-shaped knife to her throat, identified himself as a police officer, and announced that he was taking her to the police station. The man was not in a uniform, nor did the victim believe he was an officer. With the knife at the prosecutrix's side, the man led her to a two-door, black-over-gold Dodge Dart Swinger, with a black interior. They both entered the car. The assailant, with the knife in his right hand, then placed his right arm around the victim and held the knife at her throat. The prosecutrix identified the defendant in court as the man who approached her and forced her to enter the car on the night in question.

The prosecutrix pleaded with defendant to let her go and he refused. He then drove around the block a few times, during which time the victim pleaded to be let out and asked defendant what he saw in her. He responded that he had been watching her for several days, after which he pulled into an alley and parked the car. The prosecutrix again pleaded to be let go, told defendant that he was a young man, and asked why he did not go to a bar up the street and pick somebody up. Defendant responded that he was not interested in that. The victim noted that defendant was very calm, and she asked him if he had ever done this before, to which defendant responded that he had, and "the last girl was willing." She stated that there was a streetlight or alley light shining through the front windshield during this conversation. Defendant asked her age and was surprised when she said she was 22. In response to further questions from defendant the prosecutrix told him that she was not married and that she was not a virgin. Defendant then held the knife to her face and told her she would be scarred for life if she did not cooperate.

Following this threat defendant removed his pants and forced the prosecutrix to perform an act of oral sex upon him. She was told to remove her clothes, which she did. Defendant then put the knife in her vaginal area and again threatened her if she did not cooperate. They

engaged in intercourse during which time the defendant called her Evelyn, which was not her name. After this occurrence, defendant got dressed, said he was sorry, and told the prosecutrix that he had only done this on three prior occasions. He asked where she could be dropped off and she told him right at the corner, which was near the home of a friend. The victim stated that defendant remained calm throughout the incident, and that his voice was softspoken and calm. She also stated that he had an odor of strong cologne and beer.

After she left the car, the prosecutrix went to the home of her friend and informed her that she had been raped. The police were called, and they arrived at the house at about 1:15 a.m. The police took the prosecutrix to the hospital where she was examined by Dr. Larson. It was stipulated that Dr. Larson and a police laboratory microanalyst would testify that a slide prepared from the vaginal tract of the prosecutrix on the date of the incident was found to contain sperm.

The prosecutrix described her assailant to the jury as being between 5'7" and 5'9" tall, 145 pounds, with black curly hair, a mustache, and sideburns. He was wearing a black leather jacket and dark clothing. She testified that she gave that description to the police. Although the assailant had told her that he was 17 or 18 years old, the prosecutrix stated she thought he was 20.

In August of 1974 the prosecutrix viewed a composite drawing which she said looked similar to her assailant. Later that same month she was shown a group of six photographs by two detectives. She selected one of the pictures and told the detective, "He's the man." She recognized the picture which she had picked out and identified defendant as being the man depicted in that photograph.

On or about September 4, 1974, the prosecutrix viewed a lineup at the police station, at which she identified defendant as her attacker. She viewed photographs of the lineup and testified that the man in the number 2 position, the defendant, was the man she identified on that day.

On cross-examination the prosecutrix stated that she was with defendant for a period of 15 to 30 minutes, during which time she was able to view the entire front of his face. When the police arrived after the incident, she described her assailant to them as having had dark eyes. She testified further, however, that she did not pay attention to the color of the attacker's eyes. She viewed his face and general appearance, but did not look directly into his eyes. At trial the prosecutrix stated that she still believed that her assailant had dark eyes.

On redirect examination the prosecutrix looked at defendant's eyes from the witness stand and testified that she was unable to determine their color. She stated that in her experience, the quantity of lighting available affects how she perceives the color of other peoples' eyes. Defense

counsel later asked the prosecutrix to step down and approach the defendant and tell the jury what color his eyes were, but she did not wish to do so and the State's objection to this procedure was sustained.

The witness also stated that she had never seen the offender before the attack. When she identified defendant's photograph to the police she was positive of her identification. Later, at the lineup, the police told her they would like her to make an identification of an individual in the lineup if she could. However, the police did not tell her that they had the man, nor did they prompt her to pick out any particular individual either during the lineup or the viewing of the photographs.

Police officer Ann Leybourne testified that on April 10, 1974, she was off duty at 8:40 p.m. and was driving in her own car, near Belle Plaine and Damen Avenues in Chicago. While driving she saw a man who appeared to fit a composite description of a man wanted for rape. She observed the man apparently gesture to a young girl who was walking by, and who appeared to ignore the gesture. Officer Leybourne identified the defendant in court as the man she saw on April 10, 1974. Officer Leybourne circled the block and drove into an alley, toward which she had seen the young girl walking. Once in the alley Leybourne saw the girl struggling with the man she had seen on Belle Plaine. As Leybourne started to get out of her car, the girl broke away from the man and ran south. The man ran north, past Leybourne, and was observed by her from a distance of 5 to 10 feet. Later the evening Officer Leybourne, the young girl, who it was learned was named Lori [_____] and another officer, searched the area for the man but were unable to find him. She testified that they were also looking for a car which had been described in the police bulletin that contained the description of the person wanted at Homicide/Sex.

In September, Officer Leybourne viewed a lineup and identified the defendant as the man she had seen struggling with Lori. The witness examined People's Exhibit No. 2, a photograph of the lineup, and testified that the defendant was in the number 2 position of the lineup.

On cross-examination Officer Leybourne testified that the man she saw matched the description of a man wanted at Homicide/Sex, for what they considered to be a pattern of rapes. The police bulletin on this man included a composite sketch which resembled the man she had seen, although the eyes in the sketch were too weakly portrayed as compared to the man she had seen. Leybourne was asked if she knew the color of either defendant's eyes or the eyes of the man who attacked Lori. She responded negatively to both questions.

Lori testified that on April 10, 1974, at 8:40 p.m. she was in a drugstore at Lincoln and Belle Plaine Avenues, where she observed a man. As Lori was walking toward her home in the 1900 block of West Belle Plaine, she

saw the man again, standing in a doorway at 1950 or 1952 Belle Plaine. The man spoke to her but she kept walking. Lori stopped to retrieve a book of matches which she had dropped and was grabbed by the man, who said, "I am a police officer and I saw you stealing something in the Sun Drugstore." Lori identified the defendant in court as that man. The defendant asked Lori if she wanted to see his identification. When she responded that she did, the defendant said, "Shut up or I will shoot you." As Lori and the defendant walked into the alley, Lori saw a girlfriend and called her by name, but the friend continued walking. The defendant told Lori, "Act like you know me" and again threatened to shoot her if she did not keep quiet. Lori placed her hands behind her back and felt an object which felt like a sharp knife. At that time a car with its lights on entered the alley. Lori struggled with the defendant, shoved him away and ran home. Lori later spoke of Officer Ann Leybourne.

On September 4, 1974, Lori viewed a lineup and identified the man who attacked her in April. The witness identified the defendant, in court, as the man she had picked from that lineup. The witness examined People's Exhibit No. 3, a photograph of the line-up, and testified that the man she identified was in the number 2 position of the lineup.

In October, Lori saw the defendant again near her grade school. At that time Lori observed him sitting in a 1970 or 1971 green Dodge with a black top. She further testified that she had described her assailant to the police as a white male, 5'8" tall, about 140 pounds, with dark hair, thick sideburns, and a mustache. He was wearing dark clothes and a striped shirt. She had described her attacker's eyes as "bright" or "staring" but did not mention a color. Lori testified that she did not know the color of the man's eyes and she did not smell cologne or alcohol on the offender.

Susan [_____] testified that on July 24, 1974, she was 15 years old, and at 10:15 p.m. on that evening, she left a McDonald's restaurant located at Harlem and Armitage Avenues and walked alone down Armitage toward her home. As she proceeded down the street she saw a man leave his car and walk toward a house. At 73rd and Armitage the man jumped out of the bushes, grabbed her by the hair and said, "I am sorry, honey, you are under arrest." Susan screamed as loudly as she could, whereupon the man dropped his hands and walked to his car. The witness identified the defendant in court as that man. Susan looked at the license plate on his car and screamed the number out loud. The defendant then told her, "I know who you are," and proceeded to get into his car. Susan testified that as she ran home she repeated the number to herself, which was GY 4537. She was able to remember it because the numbers were the first four numbers of her telephone number.

On August 20, 1974, Susan viewed a lineup and identified the defendant.

On the Saturday prior to her testimony at defendant's trial, Susan saw defendant Gonzales at the drugstore at 1600 North Harlem, where she works. The defendant stared at her for a few seconds and then she walked away.

Susan testified that she had described her assailant to the police as being 5'8" or 9" tall, dark-skinned, with a mustache, and about 25 years old. She had also stated that he had a medium build and appeared to be Italian or Spanish. The man did not smell of strong cologne or alcohol.

Karyn [_____] testified that on March 26, 1974, she was 12 years old, and was walking home from a girl scout meeting at about 9 p.m. As Karyn was walking alone toward her home in the 4200 block of North Damen, she passed a fence and a man stopped her. He grabbed her and put keys around her throat, whereupon she screamed. The man told her to shut up or he would cut her throat. The man told her that he was a police officer and that she had stolen his sister's bicycle and that he was going to take her to the police station. He also told her that he had seen her shoplifting at Wieboldt's.

The assailant made her get into a car which was similar to a Dodge Dart or Plymouth, and drove to an alley near Ravenswood and Belle Plaine, where he stopped. The car had a greenish-yellow interior and no license plates. He asked her if she had ever seen a man's penis before and she said no. The man forced her to engage in certain sexual acts, including intercourse, for about 45 minutes. During this time he told her to tell him that she was Theresa, which she did. After the incident she was told to get dressed and was asked where she lived. Karyn got dressed and told the man she lived near Damen. The assailant dropped Karyn off near Ravenswood Hospital, whereupon she went home and told her mother what had occurred.

Karyn described her assailant as being 5'8" tall, thin build, with black curly hair, sideburns and a mustache, and between 25 and 30 years old. She could not tell the color of his eyes. She also stated that the man had a medium-dark complexion, wore a black leather jacket, and smelled of liquor but not cologne. The attacker's car had no license plate on the back and the interior was a greenish-yellow color. She identified defendant in court as the man who attacked her.

On March 28, 1974, Karyn participated in the making of a composite drawing of the offender. On September 4, 1974, she viewed a line-up and identified the man in the number 2 position as "looking similar" to her attacker, but stated that that person's hair was straighter than her assailant's hair. Karyn stated that the reason she did not make a positive identification at the lineup was because of the hair. However, she identified defendant in court as both being the individual she recognized at the lineup and as being her attacker.

Investigator James Phelan described the lineup of September 4, 1974. He identified defendant as being the man who stood in the number 2 position in that lineup. Phelan also stated that he had interviewed defendant and discovered that defendant would be 21 years of age on the following day, September 5, 1974.

The trial court took judicial notice of People's Exhibit No. 4, a true photostatic copy of an application for 1974 license plates by Alexander Gonzales of 2271 West Sunnyside, Chicago, Illinois, for a 1975 Dodge with the license number GY 4537 which was issued on May 20, 1974. The State then rested its case.

Officer Thomas Bagnali testified for the defense that on March 30, 1974, he was the first officer on the scene and spoke with the prosecutrix concerning the incident in question. He stated that the victim was in a traumatized state. She described her attacker as a white male, who told her he was 17 or 18 years old, about 5'8" tall, with short, dark, curly hair, dark eyes, a medium complexion, and weighing 140 to 150 pounds. She described the offender's car as a 1971 to 1974 two-door Dodge, with a gold exterior and a black interior.

Investigator Ronald Mudry testified that he interviewed the complaining witness on March 30, 1974. On April 14, 1974, Mudry made out a report which included the following description of the offender: a white male, 20 to 25 years old, 5'8" tall, 140 pounds, medium-length, black curly hair, a slight mustache, and wearing a black leather jacket, a black shirt and trousers. The prosecutrix had made no mention of the color of the attacker's eyes. She had indicated that he had an odor of cologne and alcohol, and that the car involved was a two-door gold Dart Swinger with a black interior. It had been freshly cleaned and had no license plates.

Investigator Barbara Gladden testified that on May 23, 1974, she interviewed Lori concerning an attack and also spoke with Officer Ann Leybourne. Based on these conversations she included in her report the following description of a wanted person: a white male, 21 to 25 years old, 145 to 150 pounds, 5'5" to 5'9" tall, black curly hair, a mustache and sideburns, wearing a short dark jacket and dark pants, and eyes unknown.

Carmen Maldonado, defendant's sister, testified that defendant returned from military service in January of 1974; she saw him about twice a week after that, when she went to visit her mother's home. She testified that defendant did not have a mustache when he left the service and started growing one in the summer of 1974, but she could not recall exactly when. The witness examined Defendant's Exhibit No. 5, a photograph of the defendant in which he had no mustache, and testified that the picture was sent to her mother shortly before her brother's release from the military. She stated that her brother's most-recognizable features were his crystal blue eyes.

Mrs. Maldonado also testified that she never knew her brother to be a heavy drinker and that he wore after shave lotion, not cologne. She had never seen him wear a black leather, or leather-like jacket, and stated that he had bought a used green Dodge when he got out of the service, which made a lot of noise and was in terrible condition.

Lucy Gonzales, the defendant's mother, testified that her son came to live in Chicago in January of 1974. At that time he did not have a mustache, and further, he did not have a mustache in March or April of 1974. His eyes are blue.

Mrs. Gonzales also testified that her son had a green Dodge, not gold, which he drove for a short time without license plates. He lived in her apartment building with his wife Diane.

Diane Gonzales, defendant's wife, testified that in February of 1974 she lived with the defendant and her son at 2172 Sunnyside Avenue. The witness testified that defendant did not have a mustache in March or April of 1974. She also testified that she did not remember the defendant wearing cologne prior to the past Christmas, when she had bought him a bottle of Brut. She had lived with defendant since his military discharge, and he seldom drank.

Diane Gonzales further testified that she and defendant owned a "beat-up" 1969 dirty-green Dodge car. It had a green vinyl interior, not a yellow-and-green tweed interior. She stated, however, that although a portion of the seat was a light color, the front four inches of the seat were a dark color, and the dashboard was a dark green. She testified that she had never known her husband to carry a knife and that he did not own a firearm, nor had she ever seen a tile or carpet cutter in the car or in his possession. She also stated that defendant never had a leather, or leather-like jacket.

Alexander Gonzales, the defendant, testified that in March of 1974 he was 20 years old and lived at 2172 West Sunnyside in Chicago with his wife and son. He had received an honorable discharge from the armed forces in January of 1974. In early February of 1974 he purchased a green Dodge from a friend of his father. The car did not look gold in any way. Defendant also testified that he did not have a mustache in March of 1974, nor did he use cologne, although he did occasionally use after shave lotion. Defendant denied committing the crimes with which he was charged.

On cross-examination defendant admitted that he had not purchased license plates for his car until late May of 1974, although he had bought it in January or February. He stated that the interior of his car was light green in color. He could not recall where he was on the date in question.

Also during cross-examination the prosecutor asked defendant if he had committed the acts previously testified to against Karyn, Susan and Lori.

Objections to such questions were sustained as being beyond the scope of defendant's direct examination. During his final argument the prosecutor commented to the jury that the testimony concerning these incidents was uncontradicted and undenied.

The jury was instructed that evidence which established that the defendant was involved in other crimes was received solely on the issue of the defendant's identification and design and should be considered only for that limited purpose.

Following their deliberations the jury found the defendant guilty of rape, deviate sexual assault and two counts of aggravated kidnapping. Defendant's motions for a new trial and in arrest of judgment were denied.

On August 23, 1976, the defendant was sentenced. This appeal follows.

OPINION

Defendant contends initially that the identification testimony of the prosecutrix was weak, vague, and unworthy of belief and therefore failed to establish his guilt beyond a reasonable doubt. The crux of his argument is that his eyes are so strikingly "crystal blue" in color that the failure of the complaining witness to mention their color, and her description of her assailant's eyes as dark, creates a reasonable doubt of his guilt. We cannot agree.

■■ Where the identification of the defendant is at issue, the testimony of even one witness is sufficient to convict, provided the witness viewed defendant under such circumstances as would permit a positive identification to be made. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) The positive identification testimony of a victim who was credible and who had an adequate opportunity to observe her assailant is sufficient to establish guilt beyond a reasonable doubt, even if that testimony is contradicted by the accused. (*People v. Davis* (1977), 53 Ill. App. 3d 424, 368 N.E.2d 721.) There can be no question that the circumstances in the instant case provided a more than adequate opportunity for the victim to make an identification of the defendant.

In this case the prosecutrix observed the defendant when she was approached on the sidewalk. She was face-to-face with defendant both on the sidewalk and in the car, where she conversed with him for a number of minutes in an attempt to gain her freedom. A light was shining through the car windshield during the conversation and subsequent rape, and the prosecutrix was able to view her attacker under these conditions at close quarters for a period of time somewhere between 15 and 30 minutes. Under these circumstances we must conclude that she had an ample opportunity to observe her assailant and make a positive identification.

■■ The fact that the prosecutrix described her assailant's eyes as dark, and that defendant had blue eyes instead, does not undermine this conclusion. Where a witness makes a positive identification, precise accuracy in description is not necessary; discrepancies, if any, go to the weight of the identification testimony and are to be evaluated by the trier of fact. (*People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907; see also *People v. Nichols* (1975), 32 Ill. App. 3d 265, 336 N.E.2d 194.) Precise accuracy in describing facial or other characteristics is unnecessary where an identification is positive. (*People v. Moore* (1977), 50 Ill. App. 3d 952, 365 N.E.2d 1356; *People v. Hunt* (1975), 34 Ill. App. 3d 472, 340 N.E.2d 203.) The significant issue is not whether there is a discrepancy between the victim's description and the defendant's actual appearance, but whether under the facts and circumstances an adequate opportunity for a positive identification existed. (See *People v. Moore; People v. Nichols.*) We have already concluded that such an opportunity did exist in this case.

■■ Therefore, we must also conclude that the prosecutrix's failure to note defendant's eyes as blue, rather than dark, was not of such significance as to render her testimony incredible and make her identification of defendant "weak and vague." (See *People v. Sanford* (1975), 34 Ill. App. 3d 485, 340 N.E.2d 255; *People v. Hunt.*) This was a question for the jury to decide. Her testimony did not change in any significant respect from the description she had given police. She had picked defendant out of a lineup and had identified his picture as being that of her attacker, and she reaffirmed these identifications in court.

Furthermore, the prosecutrix testified that she did not look directly into defendant's eyes and that she did not pay any attention to the color of his eyes. The witness explained that she does not look into peoples' eyes when speaking with them, although she does look into and at their faces. In this case then, which occurred at about 12:30 to 1 a.m. under the illumination of a street or alley light, the defendant's eyes might well have appeared dark in hue at a passing glance. Yet, there would still have been ample time and opportunity to observe his face and make a positive identification.

The jury not only heard the testimony in the instant case, but also saw defendant in court and was in a superior position to evaluate the weight to be given to any alleged discrepancy in defendant's description. The jury was not required to regard the alleged discrepancy concerning the color of defendant's eyes as sufficient to create a reasonable doubt of his guilt. See *People v. Evans* (1962), 25 Ill. 2d 194, 184 N.E.2d 836.

■■ Defendant argues collaterally that in view of the discrepancy concerning eye color, the remaining evidence put in by the defense gains added importance. Once again, however, this was clearly a matter for the

jury's determination. (See *People v. Evans.*) The fact that defense witnesses testified that defendant had no mustache in March of 1974, that his car was green, and that he never owned a dark leather or leather-like jacket, does not create a reasonable doubt of guilt. (See *People v. Evans.*) A conflict in testimony does not in itself establish a reasonable doubt of an accused's guilt. *People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644.

■■ We are aware of the heavy burden imposed on this court in its review of rape cases. However, as our supreme court stated in *People v. Reese* (1973), 54 Ill. 2d 51, 57-58, 294 N.E.2d 288, 291:

> "Courts of review have a special duty of carefully examining the evidence in rape cases. [Citation.] But in doing so the court may not encroach upon the function of the trier of fact to weigh credibility and otherwise assess the evidence which was presented. [Citation.] That evidence has been conflicting will not justify a reversal of a finding by the trier of fact. [Citations.] A court of review will not set aside a finding of guilty unless the evidence is so palpably contrary to the finding or so unreasonable, improbable or unsatisfactory as to cause reasonable doubt as to the guilt of the accused. [Citation.]"

The evidence in this case is not so unreasonable or unsatisfactory as to create a reasonable doubt of guilt that would justify reversal by this court. The prosecutrix's testimony was clear and convincing and her identification of defendant positive. In addition, even if unconvincing, her testimony was corroborated by evidence of the other offenses (see *People v. Osborn* (1977), 53 Ill. App. 3d 312, 368 N.E.2d 608), which we subsequently discuss in this opinion as having been properly admitted as competent evidence of a common design or *modus operandi*. In sum, the jury was fully warranted in believing the State's evidence and finding defendant guilty. See *People v. Evans.*

■■■ Defendant contends secondly that the introduction of evidence of other offenses resulted in the denial of his right to a fair trial. It is correct that, as a general rule, evidence of other crimes is not admissible as proof of guilt for the offense charged. (*People v. Stadtman* (1974), 59 Ill. 2d 229, 319 N.E.2d 813; *People v. Osborn.*) However, the exception to this rule has been strongly established that evidence relevant to the issue of guilt of the offense on trial may be admissible even though such evidence also tends to establish the accused's commission of other offenses. (See *People v. Osborn.*) As our supreme court stated in *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489, 492-93:

> "It is, of course, generally true that evidence of extra-indictment offenses, that is, evidence of crimes other than the one for which the accused is being tried, is not admissible, but there are situations

of exception. Evidence which tends to prove a fact in issue is admissible though it may be evidence showing that the accused has committed a crime other than the one for which he is being tried, and evidence which goes to show motive, intent, identity, absence of mistake or *modus operandi* is admissible though it may show the commission of a separate offense. [Citations.] In fact it has been broadly held that evidence of other offenses is admissible if relevant for any purpose other than to show propensity to commit a crime. [Citations.]"

The complained-of evidence in the instant case was properly admitted within these exceptions to the general rule. The attacks on the other women and the rape of the complainant bear significant similarities which rendered evidence of the former relevant as proof of the existence of a common scheme or design, and *modus operandi*. See *People v. Osborn*, and cases cited therein; *People v. Oliver* (1977), 50 Ill. App. 3d 665, 365 N.E.2d 618; *People v. Middleton* (1976), 38 Ill. App. 3d 984, 350 N.E.2d 223.

All of the victims in these incidents were young women. The complainant testified that her attacker appeared surprised when she told him that she was 22 years old. Lori was in grade school; Susan was 15 years old; and Karyn was 12 years old. Furthermore, all the women were attacked on the street while walking during the evening hours, and three of the victims described their attacker as wearing dark clothes with a short dark jacket. Three of these attacks occurred in the same general geographic area: the 3600 and 1900 blocks of West Belle Plaine Avenue, and the 4200 block of North Damen Avenue, and the time span between the attacks was fairly short: March 26 and 30, April 10, and July 24 of 1974. These are all factors which may variously be considered in whether evidence is admissible to show a common scheme or design. See *People v. Osborn*, and cases cited therein.

In addition, however, more striking similarities exist among the four incidents in this case. In each incident the assailant either indicated that he was a police officer or that he was going to arrest the victim. He told the prosecutrix that he was an officer and was taking her to the station. He told Lori that he was an officer and had seen her steal something. He indicated to Karyn that he was a policeman, that he had seen her shoplifting and that she had taken his sister's bicycle, and therefore she was going to the station. He also told Susan that she was under arrest.

The complainant and Karyn were both abducted from the street and driven into an alley, while Lori was forced to walk into an alley. The assailant asked the prosecutrix if she was a virgin and asked Karyn if she had ever seen a man's penis before. Following the attack on the

prosecutrix the assailant asked her where he could drop her off, and similarly, in the attack on Karyn, he drove her to a requested location after the incident.

An additional similarity with respect to three of the girls is that the attacker indicated some interest and knowledge of the victims outside of the attacks themselves. He told the prosecutrix that he had been watching her for several days; he had been seen at Lori's school after he attacked her; and he told Susan he knew who she was and saw her again after the attack in the drugstore where she worked.

All four women identified defendant as their assailant.

In view of these similarities, we are satisfied that the trial court properly admitted the evidence of the other offenses in this case. It is correct that differences exist among the four incidents; however, the combination of factual similarities recited above is sufficient to make evidence of the other offenses relevant as proof of the existence of a common design and *modus operandi.* See *People v. Osborn.*

We recognize that even where relevant and material, the probative value of such evidence must be weighed against its prejudicial impact, and where the latter outweighs the former, it should be excluded. (*People v. Oliver; People v. Butler* (1971), 133 Ill. App. 2d 299, 273 N.E.2d 37.) However, this decision is left to the sound discretion of the trial court. *People v. Rogers* (1975), 31 Ill. App. 3d 981, 335 N.E.2d 48.

In this case, we cannot say that the trial court abused its discretion, in view of the strong similarities among the incidents. The mere fact that sex crimes are involved in these offenses is not sufficient in itself to force a conclusion that the prejudicial impact of this evidence outweighed its probative value. There have been numerous instances where courts of review have upheld the admission of evidence of other crimes in trials involving sex offenses. (See *People v. Middleton,* and cases cited therein; *People v. Osborn,* and cases cited therein; *People v. Oliver.*) In addition, we note that in this case the jury was specifically instructed that the evidence of the other offenses should be considered only for the limited purposes for which it was admitted; *i.e.,* to show a common scheme or design. Thus, the evidence was not to be considered as proof that defendant was a "bad man" with a propensity toward criminal activity. As the court stated in *People v. Oliver:*

> "This evidence fairly tends to establish that both crimes were committed by the same man. Whether that man was the defendant was a question of fact for the jury, based on their assessment of the credibility of the identification testimony. This evidence is not of such a nature as to highly inflame prejudice against the defendant in the minds of the jury. Accord, *People v. Walker* (1966), 34 Ill. 2d

23, 213 N.E.2d 552; *People v. Lehman; People v. Tranowski, People v. Norfleet* (1st Dist. 1972), 4 Ill. App. 3d 758, 281 N.E.2d 761." (50 Ill. App. 3d 665, 675, 365 N.E.2d 618, 626.)

We reach a similar conclusion in the instant case.

Defendant contends thirdly that he was compelled to surrender his fifth amendment right to remain silent. The crux of his argument is that "in order to lessen the prejudicial effect of the State's improper reliance on other alleged offenses, defendant was forced to * * * take the witness stand in his own defense to deny that he committed the crime charged." Since we have determined that the evidence of other offenses was properly admitted in this case, we find no merit to this contention. Furthermore, we note that the choice faced by defendant in this regard is one which faces any accused in a criminal proceeding: whether or not to take the stand and deny the charges, thus waiving his right to remain silent. The additional evidence of other offenses did not change the nature of this choice.

■■ Finally, defendant argues that he was denied a fair trial by the prosecutor's prejudicial comments during closing arguments. Specifically, defendant claims that it was improper for the State to argue to the jury that the testimony concerning the attacks on Lori, Susan and Karyn was "uncontradicted and undenied." We must disagree.

This same argument was raised in *People v. Middleton* by a defendant who was charged with aggravated battery and deviate sexual assault. In *Middleton,* the testimony of six victims, other than the complainant, was properly admitted for the purpose of establishing the *modus operandi* of the defendant. During closing argument the prosecutor reminded the jury that the defendant never denied or contradicted the testimony of the six other victims. The defendant in that case, as in the instant one, contended that this statement by the prosecutor violated his fifth amendment right to remain silent, thus denying him a fair trial. In rejecting this contention the *Middleton* court stated:

> "The defendant waived his right to silence by taking the stand to deny the complainant's allegations, and it was, therefore, proper to remind the jury of those aspects of the State's case which the defendant did not deny. (*Caminetti v. United States* (1917), 242 U.S. 470, 61 L. Ed. 442, 37 S. Ct. 192; *United States v. Weber* (3d Cir. 1970), 437 F.2d 327.) The cases cited by defendant prohibit prosecutorial reference to a defendant's pretrial reliance on the fifth amendment, whether or not the defendant testifies at trial. They hold that a defendant does not retroactively waive his pretrial fifth amendment rights by taking the stand at trial. But defendant has cited no cases for the quite different proposition he asserts that an accused can take the stand at trial, deny some but

not all of the evidence against him, and then claim immunity from prosecutorial comment on his failure to answer the rest of the evidence during his testimony." (38 Ill. App. 3d 984, 993, 350 N.E.2d 223, 230.)

We find this statement applicable to the instant case and hold that, defendant having taken the stand, the State could properly argue the evidence to the jury and comment upon that testimony which defendant chose not to deny.

For all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.